Stephen R. BURKHOLDER and
Darleen G. Burkholder,
Appellants

v.

ZONING HEARING BOARD OF
RICHMOND TOWNSHIP and
Richmond Township.

Stephen R. Burkholder and
Darleen G. Burkholder

v.

Zoning Hearing Board of Richmond
Township and Richmond
Township.

Appeal of: Richmond Township.

Commonwealth Court of Pennsylvania.

Submitted on Briefs April 5, 2006.
Decided July 14, 2006.

Christopher J. Hartman and Barbara J.
Kern, Reading, for appellants.

Robert P. Grim, Kutztown and Daniel E. Brannen, Jr., Centre Hall, for appellee, Richmond Township.

John J. Bell, Camp Hill, for amicus curiae, Pennsylvania Farm Bureau.

Thomas A. Linzey, Chambersburg, for amici curiae, Pennsylvania Farmers Union and the Pennsylvania Family Farm Coalition.

Thomas L. Wenger, Harrisburg, for amicus curiae, Pennsylvania State Association of Township Supervisors.

BEFORE: COLINS, President Judge, McGINLEY, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, LEADBETTER, Judge, SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge SIMPSON.

In this land use case, we are asked whether the Nutrient Management Act[1] (NMA) and its implementing regulations preempt a setback requirement expressed in a local zoning ordinance. Stephen R. and Darleen G. Burkholder (Landowners)[2] and Richmond Township (Township) cross-appeal from an order of the Court of Common Pleas of Berks County (trial court) that determined the NMA preempts the local setback requirement as applied to one of two structures Landowners propose to construct in order to expand their existing hog raising operation. Concluding the NMA and its implementing regulations

preempt the local setback requirement as applied to both of Landowners' proposed structures, we affirm in part and reverse in part.

Landowners own a 57–acre, triangular-shaped parcel in Richmond Township, Berks County (Subject Property). The Subject Property is bordered to the north by Fleetwood–Lyons Road, to the southeast by Norfolk Southern Railroad tracks, and to the southwest by Deka Road. The Subject Property, which is zoned R–A Rural Agricultural, shares a boundary with the R–1 Low Density Residential, L–I Light Industrial, and I Industrial zoning districts.

Landowners purchased the Subject Property in 1993 from Stephen Burkholder's parents, who previously subdivided a larger tract of 152 acres into the Subject Property and one other parcel. The entire 152–acre tract, including the Subject Property, lies within the Township's Agricultural Security Area (ASA) under the Agricultural Area Security Law (AASL),[3] and is subject to an agricultural conservation easement.

Beginning in 1957, the elder Burkholders conducted a hog raising operation over the entire 152–acre property. Landowners assumed control of the operation in 1985 and continue to conduct the operation on the Subject Property.

Due to the intensity of the operation, Landowners' current operation is subject

1. Act of May 20, 1993, P.L. 12 No. 6, *as amended, formerly* 3 P.S. §§ 1701–1718, commonly referred to as "Act 6." Act 6 was repealed by the Act of July 6, 2005, P.L. 112, No. 38 (Act 38), and similar language is now codified at 3 Pa C.S. §§ 501–522.

2. Landowners are joined by the Pennsylvania Farm Bureau as *amius curiae.* In addition, the Township is joined by the Pennsylvania State Association of Township Supervisors as well as the Pennsylvania Farmers Union and

the Pennsylvania Family Farm Coalition as *amici curiae.*

3. Act of June 30, 1981, P.L. 128, *as amended,* 3 P.S. §§ 901–915. An ASA is "[a] unit of 250 or more acres of land used for the agricultural production of crops, livestock and livestock products under the ownership of one or more persons...." Section 3 of the AASL, 3 P.S. § 903; *see also 41 Valley Assocs. v. Bd. of Supervisors of London Grove Twp.,* 882 A.2d 5 (Pa.Cmwlth.2005).

to the NMA and its implementing regulations.[4] The NMA, which is concurrently administered and enforced by the Department of Environmental Protection (DEP) and the Pennsylvania State Conservation Commission (PSCC), requires operators of "Concentrated Animal Operations" (CAOs), to develop and implement nutrient management plans. *See* Sections 2, 4 and 6 of the NMA, *formerly* 3 P.S. §§ 1702, 1704, 1706. CAOs are farms with more than two animal units for each acre of land on which animal manure is applied. *Former* 3 P.S. § 1706; 25 Pa.Code § 83201.[5]

The preparation and implementation of nutrient management plans is the centerpiece of the NMA. *See* Michael M. Meloy, *An Overview of Nutrient Management Requirements in Pennsylvania,* 10 Penn St. Envtl. L.Rev. 249 (2002). Among other things, a nutrient management plan controls the storage and disposal of manure generated by a CAO, and regulates the amount and frequency of manure application to crops. Id. Notably, Landowners maintain a DEP-, PSCC-approved nutrient management plan.

Currently, Landowners operate a "partial" "all in/all out" hog raising operation. In the "all in/all out" method, a farmer raises hogs from birth to maturity before selling them. The "all in/all out" method consists of three stages. The first stage is the "farrowing" stage, during which a farmer provides oversight and care for the sows and newborn piglets during the birthing process. In the second stage, the newborns are weaned from the sows and moved to a nursery where they remain until they are eight to 10 weeks of age. In the third and final stage, the pigs are moved to a "finishing" area where they are cared for until they reach five to six months of age and are deemed "finished" and made available for sale. Landowners currently house 3,500 to 4,000 young pigs. They do not, however, possess sufficient facilities to "finish" all pigs birthed on the Subject Property. As a result, Landowners' operation is a "partial," rather than a "total," "all in/all out" hog raising operation.

As a "partial" "all in/all out" operation, Landowners sell approximately half of the pigs birthed on the Subject Property as "feeder" pigs at eight to 10 weeks of age at a substantially lower price than could be obtained for "finished" pigs. Landowners seek zoning relief to expand their operation from a "partial" to a "total" "all in/all out" hog raising operation so they can "finish" all pigs birthed on the Subject Property. Expanding to a "total" "all in/all out" operation would enhance the health of Landowners' herd and would also result in a financial gain for Landowners. Further, because all pigs would remain on the Subject Property until "finished," the overall population would increase to approximately 5,300 pigs.

In order to expand their operation, Landowners propose to construct two new facilities. More specifically, Landowners

---

**4.** Regulations implementing the NMA are codified at 25 Pa.Code Chapter 83, Subchapter D and generally went into effect on October 1, 1997. They were published in the Pennsylvania Bulletin on June 27, 1997. *See* 27 Pa. Bull. 3161 (June 27, 1997).

**5.** The regulations attendant to the NMA define a CAO as an agricultural operation "where the animal density exceeds two AEUs per acre on an annualized basis." 25 Pa.

Code § 83.201. In turn, an "AEU" is an "animal equivalent unit," which is defined as "[o]ne thousand pounds live weight of livestock or poultry animals, regardless of the actual number of individual animals comprising the unit." Id. In addition, an "AEU per acre" is defined as "[a]n animal equivalent unit per acre of cropland or acre of land suitable for application of animal manure." Id.

seek to construct a 68–foot by 202–foot building that would house approximately 1,750 pigs during the "finishing stage" (Finishing Building). Landowners propose to construct the Finishing Building directly above a nine-foot deep manure storage pit.

In addition, Landowners seek to construct a 70–foot by 42–foot addition to the end of an existing farrowing and nursery building (Addition). The Addition would enable Landowners to consolidate their existing, separate nursery and farrowing operations into one building. Temporary manure storage would occur in shallow pits directly below the Addition.

Because of the triangular-shape of the Subject Property, Landowners propose to locate both structures less than 1500 feet from adjoining residential properties and/or zoning district boundaries. This aspect of the proposal is the basis for much of the litigation.

Under the terms of the Richmond Township Zoning Ordinance of 1998 (Ordinance), Landowners proposed expansion is considered "Intensive Agricultural Activity." *See* Section 201.4 of the Ordinance. To engage in this type of activity in the R–A zoning district, Landowners are required to obtain a special exception. *See* Section 402.3 a. of the Ordinance. Section 804.7 of the Ordinance sets forth five criteria an applicant must satisfy to obtain a special exception for intensive agricultural activity. That Section states, in its entirety:

804.7  Intensive Agricultural Activity

Intensive agricultural activities include, but are not limited to, mushroom farms, poultry and egg production, and dry lot farms, wherein the character of the activity involves a more intense use of land than found in normal farming operations.

a.  *Intensive agricultural activities shall not be located within one thousand five hundred (1,500) feet of another zoning district or existing residence located within the Agriculture or any other zoning district.*

b.  A minimum lot size of five (5) acres is required for intensive agricultural activities; which shall be so located on the lot as to provide front, side, and rear yards of one hundred (100) feet. The maximum height of [a] building used for intensive agricultural use is thirty-five (35) feet or two and one-half (2–1/2) stories, excluding appurtenances.

c.  Commercial composting is prohibited. Any on-site composting shall be limited for use on premises on which such composting is made and produced.

d.  Solid and liquid wastes shall be disposed of daily in a manner to avoid creating insect or rodent problems, or a public nuisance. No emission of noxious, unpleasant gases shall be permitted in such quantities as to be offensive outside the lot lines of the tract occupied by an intensive agricultural user.

e.  Dry lot feeding stations shall be permanently paved.

Section 804.7 of the Ordinance, Reproduced Record (R.R.) at 159a (emphasis added). At issue here is the 1500–foot setback requirement in subsection "a."

In October 2002, Landowners filed an application with the Richmond Township Zoning Hearing Board (ZHB) seeking special exceptions for the proposed facilities pursuant to Section 804.7 of the Ordi-

nance.[6] In their amended application, Landowners asserted, among other things, the 1500–foot setback requirement was invalid because it conflicted with the NMA's less stringent setback requirements.[7]

After nine days of hearings, the ZHB issued a 2–1 decision rejecting all of Landowners' requested relief. Landowners appealed.

Without taking additional evidence, the esteemed trial court affirmed in part and reversed in part. The trial court addressed Landowners' contention that the NMA preempts the 1500–foot setback requirement contained in Section 804.7 a. It pointed out the NMA contains a preemption provision that prohibits local regulation of the "construction, location or operation" of a "manure storage facility" as that term is defined in the NMA's implementing regulations. Under the NMA's regulations, the most stringent setback requirement for manure storage facilities is 300 feet. Accordingly, the trial court determined that to the extent Section 804.7 a. of the Ordinance regulates manure storage facilities, it is more restrictive than the NMA, and it is in conflict with the NMA and its regulations.

Therefore, the trial court framed the dispositive issue: whether Landowners' proposed Finishing Building and Addition are manure storage facilities under the NMA's regulations. Applying the definition to Landowners' proposed buildings, the trial court determined Landowners' proposed Finishing Building fell within the definition of a "manure storage facility," but Landowners' proposed Addition did not. Consequently, the trial court determined Landowners could construct their proposed Finishing Building without regard to the 1500–foot setback requirement, but could not construct the proposed Addition within the 1500–foot setback. As such, the trial court reversed the ZHB's denial of Landowners' request for a special exception for the Finishing Building, but affirmed the ZHB's denial of their request for a special exception for the Addition.[8] Both parties now appeal to this Court.[9]

6. As stated in footnote 1, the NMA, originally enacted in 1993, was repealed and recodified as Act 38 in July 2005. Landowners submitted their special exception application in October 2002 (with amended applications filed in January and July 2003); thus, the 1993 version of the NMA applies here. As a result, all references to the NMA in this opinion are to the 1993 version. Notably, Section 4 of Act 38 indicates, with certain enumerated exceptions, "any difference in language between [Act 38] and the [NMA] is intended only to conform to the style of the Pennsylvania Consolidated Statutes and is not intended to change or affect the legislative intent, judicial construction or administration and implementation of the [NMA]."

7. In addition to seeking a special exception, Landowners sought dimensional variances from the setback requirement on the grounds they could not construct the Finishing Building or Addition without encroaching on the 1500–foot setback. Landowners also raised substantive validity challenges to Sections 804.7 a., c., and d. of the Ordinance.

8. Originally, Landowners also proposed to construct a third building for composting purposes. Before the trial court, however, Landowners' counsel stated the proposed composting operation does not constitute an intensive agricultural use and, as a result, Landowners did not seek a ruling on whether Section 804.7 a. applied to their proposed composting building. As such, the trial court did not render a decision on that issue. Landowners do not address their proposal to construct a composting building in their brief to this Court.

9. In its opinion, the trial court rejected Landowners' assertions that Section 804.7 a. of the Ordinance conflicts with Section 603(h) of the Pennsylvania Municipalities Planning Code, Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. § 10603(h), the Right to Farm Law, Act of June 10, 1982, P.L. 454, *as amended*, 3 P.S. §§ 951–957, or the AASL, so as to entitle Landowners to construct the Addition. The trial court also determined Landowners were not entitled to a dimensional variance from

In their appeal,[10] Landowners assert the trial court correctly determined the NMA and its implementing regulations preempt the 1500–foot setback requirement expressed in Section 804.7 a. of the Ordinance. Further, they contend, the trial court properly determined their proposed Finishing Building is a "manure storage facility" as defined by the regulations promulgated pursuant to the NMA. However, Landowners argue that the trial court erred in determining their proposed Addition is not a "manure storage facility," and, therefore, erred in determining the NMA did not preempt the setback requirement with regard to the Addition.[11]

The Township counters neither of Landowners' proposed structures are "manure storage facilities" within the meaning of the NMA's regulations as Landowners would primarily use these structures for animal confinement purposes, not manure storage. It argues, although the NMA's regulations contain setback requirements for manure storage facilities, there are no such requirements for other types of facilities. Because Landowners' proposed structures are not manure storage facilities under the NMA, the Township contends, it is free to regulate setbacks for those structures.

Rejecting Landowners' contention that the NMA and its attendant regulations preempt the 1500–foot setback requirement expressed in Section 804.7 a. of the Ordinance, the ZHB determined:

25. Section 1717 of the [NMA] preempts local regulation of construction of facilities used for manure storage. 3 P.S. [§ ]1717.

26. Section 804.7.a. of the Ordinance governs the siting of structures, not manure storage.

ZHB Op., 11/26/03, Findings of Fact (F.F.) Nos. 25, 26. Thus, the ZHB concluded the NMA does not preempt Section 804.7 a. As set forth more fully below, we agree with the trial court that the ZHB's determinations are erroneous as the ZHB ignores

---

the setback requirement for the proposed Addition as they did not establish the requisite hardship. Additionally, because the ZHB denied Landowners' special exception request based solely on the proposal's non-compliance with the setback requirement in Section 804.7 a., the trial court determined Landowners' continued challenges to Sections 804.7 c. and d. were moot. The parties' briefs to this Court address the validity of the setback requirement in Section 804.7 a. of the Ordinance, and do not address Landowners' prior challenges to Sections 804.7 c. and d.

10. Because the parties did not present additional evidence after the ZHB's decision, our review is limited to determining whether the ZHB committed an abuse of discretion or an error of law. *Allegheny W. Civic Council, Inc. v. Zoning Bd. of Adjustment of the City of Pittsburgh*, 547 Pa. 163, 689 A.2d 225 (1997).

11. Preliminarily, we note, after the parties filed their briefs, Landowners filed a post-submission communication with this Court pursuant to Pa. R.A.P. 2501(a) ("[a]fter the argument of a case has been concluded or the case has been submitted, no ... letter relating to the case shall be ... submitted ... to the court or any judge thereof, except upon application...."). The communication consists of two letters from the Office of Attorney General in which the Attorney General opines "Richmond Township Ordinance No. 81–2000 unlawfully prohibits or limits a normal agricultural operation in violation of Act 38 of 2005, 3 Pa.C.S. §§ 311–318, the [NMA]...." The Township moves to strike the post-submission communication asserting the letters are irrelevant, and Pa. R.A.P. 2501 does not provide the appropriate procedure by which to share the Attorney General's opinions with this Court.

Upon review, we grant the Township's application to strike. More specifically, the letters from the Attorney General's Office do not specify the sections of the Ordinance that violate the NMA. Thus, it is unclear whether the Attorney General is of the opinion that the specific section of the Ordinance at issue here violates the NMA.

the express language of the NMA's preemption provision as well as the NMA's regulations.

■ "The matter of preemption, is a judicially created principle, based on the proposition that a municipality, as an agent of the state, cannot act contrary to the state." *Duff v. Twp. of Northampton*, 110 Pa.Cmwlth. 277, 532 A.2d 500, 503 (1987), *aff'd per curiam*, 520 Pa. 79, 550 A.2d 1319 (1988). "In other words, a municipality may be foreclosed from exercising police power it would otherwise have if the Commonwealth has sufficiently acted in a particular field." *Hartman v. City of Allentown*, 880 A.2d 737, 747 (Pa.Cmwlth.2005).

■ As a general matter, the state is not presumed to preempt a field merely by legislating in it. *Kightlinger v. Bradford Twp. Zoning Hearing Bd.*, 872 A.2d 234 (Pa.Cmwlth.2005). Rather, the General Assembly must clearly express its intent to preempt a field in which it legislated. Id.

■ The test for preemption in this Commonwealth is well established. Either the statute must state on its face that local legislation is forbidden or indicate "an intention on the part of the legislature that it should not be supplemented by municipal bodies." *W. Pa. Rest. Ass'n v. City of Pittsburgh*, 366 Pa. 374, 381, 77 A.2d 616, 620 (1951). The consequence of a determination of preemption is severe. If the General Assembly preempts a field, the state retains all regulatory and legislative power for itself and no local legislation is permitted. Id. *Accord Council of Middle-*

*town Twp. v. Benham*, 514 Pa. 176, 523 A.2d 311 (1987).[12] It is well settled a municipal ordinance cannot be sustained to the extent it is contradictory to or inconsistent with, a state statute. *W. Pa. Rest. Ass'n*. "Obviously local legislation cannot permit what a state statute or regulation forbids or prohibit what state enactments allow." *Duff*, 532 A.2d at 504 (emphasis deleted).

In *Mars Emergency Medical Services., Inc. v. Township of Adams*, 559 Pa. 309, 740 A.2d 193 (1999), our Supreme Court indicated state statutes can address the issue of preemption in three ways. They can either: (1) expressly specify municipalities may enact ordinances not inconsistent with the state law that promote the state law's purpose; (2) expressly forbid municipal legislation; or (3) be silent on the issue of preemption while regulating an industry or occupation. *See also Synagro–WWT, Inc. v. Rush Twp.*, 299 F.Supp.2d 410 (M.D.Pa.2003).

Recognizing the clarity with which the General Assembly must express an intent to preempt and the significance of such a determination, our Supreme Court "found an intent to totally preempt local regulation in only three areas: alcoholic beverages, banking and anthracite strip mining." *Benham*, 514 Pa. at 182, 523 A.2d at 314. Accordingly, absent a clear statement of legislative intent to preempt, state legislation will not generally preempt local legislation on the same issue. *Mars Emergency Med. Servs.* Mindful of these

---

**12.** Pertinent questions in determining if a state statute preempts a municipal ordinance are:

(1) Does the ordinance conflict with the state law, either because of conflicting policies or operation[al] effect, that is, does the ordinance forbid what the legislature has permitted? (2) Was the state law intended expressly or impliedly to be exclusive in the

field? (3) Does the subject matter reflect a need for uniformity? (4) Is the state scheme so pervasive or comprehensive that it precludes coexistence of municipal regulation? (5) Does the ordinance stand as an obstacle to the accomplishment and execution of the full purposes and objectives of the legislature?
*Duff*, 532 A.2d at 505.

principles, we examine the legislative intent of the NMA.[13]

The cardinal purpose of the NMA is to "establish criteria, nutrient management planning requirements and an implementation schedule for the application of nutrient management measures on certain agricultural operations which generate or utilize animal manure." 3 P.S. § 1702(1) (**"Declaration of legislative purpose"**). In addition, the NMA is intended:

(2) To provide for the development of an educational program by the [PSCC] in conjunction with the Cooperative Extension Service of The Pennsylvania State University, the Department of Agriculture and conservation districts to provide outreach to the agricultural community on the proper utilization and management of nutrients on farms to prevent the pollution of surface water and ground water.

(3) To require the [PSCC], in conjunction with the Cooperative Extension Service of The Pennsylvania State University, [DEP], Department of Agriculture and the Nutrient Management Advisory Board to develop and provide technical and financial assistance for nutrient management and alternative uses of animal manure, including a manure marketing and distribution program.

(4) To require [DEP] to assess the extent of nonpoint source pollution from other nutrient sources, determine the adequacy of existing authority and programs to manage those sources and make recommendations to provide for the abatement of that pollution.

3 P.S. § 1702(2)-(4).

Of the three classes of state statutes outlined by our Supreme Court, the NMA falls within the first class because it expressly permits consistent, no more stringent, municipal regulations. *Synagro–WWT.* The pertinent section states, in its entirety:

**Section 17. Preemption of local ordinances**

This act and its provisions are of Statewide concern and *occupy the whole field of regulation regarding nutrient management to the exclusion of all local regulations. Upon adoption of the regulations authorized by section 4 [of the NMA], no ordinance or regulation of any political subdivision or home rule municipality may prohibit or in any way regulate practices related to* the storage, handling or land application of animal manure or nutrients or to *the construction, location or operation of facilities used for storage of animal manure* or nutrients or practices otherwise regulated by this act *if the municipal ordinance or regulation is in conflict with this act and the regulations promulgated thereunder. Nothing in this act shall prevent a political subdivision or home rule municipality from adopting and enforcing ordinances or regulations which are consistent with and no more stringent than the requirements of this act and the regulations promulgated under this act,* provided, however, that no penalty shall be assessed under any such local ordinance or regulation for any violation for which a penalty has been assessed under this act.

Section 17 of the NMA, *formerly* 3 P.S. § 1717 (emphasis added).

Explaining the General Assembly's recognition of the need for uniform regulation of intensive livestock operations that gen-

---

**13.** Notably, this Court recently addressed other preemption issues in the land use context. *See Liverpool Twp. v. Stephens,* 900 A.2d 1030 (Pa.Cmwlth.); *Se. Chester County Refuse Auth. v. Zoning Hearing Bd. of London Grove Twp.,* 898 A.2d 680 (Pa.Cmwlth.2006).

erate and store animal manure, several scholarly authors observe:

> As livestock operations grew in size and located in areas with little previous intensive livestock operations, community residents and environmental groups began to voice objections. Several local townships passed ordinances that sought various ways to prevent [intensive livestock operations] from locating in the township or to impose significant conditions upon their operations. Producer interests faced regulatory action at the local level that could reflect widely different approaches and restrictions in each community. Responding to this situation, the Pennsylvania legislature passed the [NMA] and declared it to be a legislative measure of statewide concern that occupied the whole field of regulation regarding nutrient management. The [NMA] specifically excluded local regulations deemed to be inconsistent with or more stringent than the requirements of the [NMA] and regulations adopted to implement it.

Charles W. Abdalla, John C. Becker, Ralph Hanke, Celia Cook–Huffman, Barbara Gray & Nancy Welsh, *Community Conflicts Over Intensive Livestock Operations: How and Why Do Such Conflicts Escalate?*, 7 Drake J. Agric. L. 7, 17 (2002) (footnotes omitted). *See also* Michael M. Meloy, *An Overview of Nutrient Management Requirements in Pennsylvania*, 10 Penn St. Envtl. L.Rev. 249, 275 (2002) (noting "in response to local pressure, certain municipalities have attempted to step into the breach and impose local regulatory controls on [CAOs]. Against this backdrop, the Pennsylvania legislature adopted the [NMA]. . . .").

Further support for the suggestion that the General Assembly intended to exercise statewide control in the field of nutrient management is found in the NMA's legislative history. During the legislative debate, the following statement was made:

> One area that I would also like to stress is that on the preemption language that was part of the original bill, we were also able to strengthen that, and I believe that we now have language that truly does preempt local ordinances and gives the agriculture operations in Pennsylvania the kind of protection that they need.

*House Legislative Journal*, Feb. 2, 1993, p. 119 (remarks of Rep. Barley).

Although there are no decisions from our appellate courts addressing preemption under the NMA and its attendant regulations, the Courts of Common Pleas of Berks and Bradford Counties rendered decisions that address this issue. *See Adam v. Zoning Hearing Bd. of Twp. of Perry*, 93 Berks L.J. 89 (C.P.Berks) (No. 99–4176, filed October 24, 2000); *McClellan v. Granville Twp. Bd. of Supervisors*, 3 Bradford L.J. 272 (C.P.Bradford) (No. 99 EQ000016, filed April 6, 2000). In both *Adam* and *McClellan*, the courts determined the NMA and its implementing regulations preempted local ordinances. A review of those cases is helpful.

First, in *McClellan*, a local governing body enacted an ordinance that imposed restrictions on the siting of CAOs in the township. Among other things, the ordinance required a 1500–foot setback for manure storage facilities. Several landowners who owned and operated a hog finishing operation that utilized manure storage pits filed suit asking the Bradford County Court to declare the local ordinance void on the grounds it was preempted by the NMA. The court first determined the legislative intent of the NMA makes clear that hog finishing operations generating and storing animal manure are subject to the NMA. The court further noted the NMA's preemption provision

prohibits local regulation of manure storage facilities where such regulation conflicts with and is more stringent than the NMA and its regulations. As to the local setback requirement, the court noted the NMA regulations contain requirements for the design, construction and location of manure storage facilities. The court determined the ordinance's 1500–foot setback requirement was in conflict with and more stringent than the various 100, 200 and 300 foot setback requirements in the NMA regulations. As such, the court held the NMA preempted the local setback requirement.

Thereafter, in *Adam*, the Berks County Court considered whether a zoning hearing board erred in granting a special exception to permit a swine breeding operation. Several objectors asserted the zoning board erred in granting relief since the applicant proposed to remove manure from the site every six months rather than daily as required by the local ordinance. Responding to this argument, the court stated that the proposed swine operation was a CAO and was subject to the NMA. Further, because the NMA regulations require removal of manure storage on a seasonal basis, the court held that the local ordinance requiring daily removal conflicted with the NMA regulations and, therefore, was preempted.

In light of the declared legislative intent of the NMA, the express language of its preemption provision, and case law interpreting the NMA, it is clear the General Assembly intended to preempt local regulation of manure storage facilities which conflicts with and is more stringent than the NMA and its regulations. Nevertheless, a municipality may enact regulations that are consistent with and no more stringent than the NMA and its implementing regulations. With this background, we consider the specific issue raised here: whether the 1500–foot setback requirement in Section 804.7 a. of the Ordinance conflicts with or is more stringent than the requirements set forth in the NMA and its attendant regulations.

On its face, the NMA's preemption provision expressly prohibits local regulation of the "construction, *location* or operation *of facilities used for storage of animal manure* . . . if the municipal ordinance or regulation is in conflict with [the NMA] and [its] regulations. . . ." *Former* 3 P.S. § 1717 (emphasis added). The NMA's regulations define a "manure storage facility" as:

A permanent structure or facility, *or portion of a structure or facility, utilized for the primary purpose of containing manure.* The storage facility of a waste management system is the tool that gives the manager control over the scheduling and timing of the spreading or export of manure. *Examples include: liquid manure structures,* manure storage ponds, *component reception pits* and transfer pipes, *containment structures built under a confinement building,* permanent stacking and composting facilities and manure treatment facilities. The term does not include the animal confinement areas of poultry houses, horse stalls, freestall barns or bedded pack animal housing systems.

25 Pa.Code § 83.201 (emphasis added).

Significantly, the regulations also specifically address minimum standards for the design, construction, *location,* operation, maintenance and removal from service of manure storage facilities. 25 Pa.Code § 83.351. Generally, manure storage facilities must be "designed, constructed, located, operated, maintained, and, when no longer used for the storage of manure, removed from service, to prevent the pol-

lution of surface water and groundwater, and the offsite migration of pollution...." 25 Pa.Code § 83.351(a)(1).

Section 83.351 contains a variety of siting criteria for manure storage facilities. Of particular import here, the siting criteria include setback requirements for manure storage facilities from surface water bodies, wells, sinkholes, property lines and public water supply sources. Id. More particularly, Section 83.351 imposes setback requirements of 100, 200 and 300 feet. 25 Pa.Code § 83.351(a)(2)(iv)(A)-(F), (v)(A)-(G). Read in its entirety, the most stringent setback requirement for a "manure storage facility" contained in the NMA's regulations is 300 feet. Id.

Section 804.7 a. of the Ordinance imposes a setback requirement of 1500 feet from "another zoning district or existing residence located within the Agriculture or other any other zoning district." Clearly, the 1500–foot setback requirement conflicts with and is more stringent than the setbacks imposed by the NMA regulations. Thus, to the extent Section 804.7 a. attempts to regulate manure storage facilities, it is preempted by the NMA.

In order to determine if the NMA and its attendant regulations apply to Landowners' proposed structures, it is necessary to consider whether the proposed Finishing Building and Addition are "manure storage facilities." As noted, a "manure storage facility" includes a "portion of a ... facility, utilized for the primary purpose of containing manure." 25 Pa.Code § 83.201. The regulation also cites several specific examples of manure storage facilities, including "component reception pits" and "containment structures built under a confinement building." Id.

As to the proposed Finishing Building, Landowners propose to construct this building in order to enable them to finish all pigs birthed on the Subject Property.

ZHB Hearing, 4/1/03, Notes of Testimony (N.T.) at 71. The floor of the Finishing Building would be slatted to allow droppings from the pigs to fall into a large storage pit situated directly below the building. F.F. No. 18. The manure storage pit would be nine feet deep as measured from the slats to the floor of the pit, with a total capacity of approximately 500,-000 gallons. F.F. No. 19. It would collect all manure generated from the hogs confined in the Finishing Building. N.T. 4/1/03 at 77. All aspects of the storage and removal of the manure are regulated within the approved nutrient management plan entered into by Landowners in accordance with the NMA. N.T. at 90–92.

Based on these characteristics, Landowners' proposed Finishing Building qualifies as a "manure storage facility." Clearly, the building's manure storage pit is as a "portion of a facility ... utilized ... for the primary purpose of containing manure." See 25 Pa.Code § 83.201. Indeed, the manure storage pit falls squarely within the specific examples of manure storage facilities cited in Section 83.201, which include "manure reception pits" and "containment structures built under a confinement building." Id.

The Township concedes the manure pit itself is the type of containment structure contemplated by the NMA. It challenges the proposed Finishing Building above the pit, claiming the building exists for the purpose of housing the pigs and is incidental or unrelated to the manure storage functions. Contrary to this assertion, the Finishing Building is utilized as a confinement structure that holds the pigs in a fixed location, which ultimately facilitates the gathering of the manure in a containment structure underneath the building. Further, as stated by the trial court:

We also find significant that the definition of "manure storage facility," specifically excludes confinement areas for certain animals, namely, poultry, horses, cows and bedded pack animals, but not hogs. Hog raising is probably the most controversial form of animal farming, due to the problems associated with hog manure. Certainly, if the intent of the regulations were to exclude hog confinement areas from being considered manure storage facilities, the regulations would have so stated.

Tr. Ct., Slip Op. at 16–17 (footnote omitted). In short, because the containment structure underneath the Finishing Building is used for the primary purpose of containing manure, the NMA applies and preempts application of the Ordinance's setback requirement to the proposed Finishing Building.

With regard to the proposed Addition, this building would house the operation's farrowing and nursery area and would also have a slatted floor. ZHB Hearing, 6/10/03, N.T. at 53–54. The base of the structure, below where the pigs are housed, would consist of a concrete pit that is approximately 24 inches deep. N.T. 6/10/03 at 54. The storage pit would function as a concrete vault that contains the manure that falls through the slatted floor. Id. As with the proposed Finishing Building, all aspects of the storage and removal

of the manure are regulated in accordance with Landowners' approved nutrient management plan. N.T. at 90–92.

Like Landowners' proposed Finishing Building, the proposed Addition falls within the broad language of the "manure storage facility" definition, as it too is a portion of a facility utilized for the primary purpose of containing manure. See 25 Pa. Code § 83.201. Like the containment structure beneath the Finishing Building, the manure storage reception pit beneath the Addition falls squarely within the regulation's cited examples. Id. Because the containment structure below the Addition is utilized for the primary purpose of containing manure, the NMA applies and preempts application of the Ordinance's setback to the Addition.[14]

The ZHB denied Landowners' requests for special exceptions for the proposed Finishing Building and Addition based solely on its determinations that the proposed structures did not comply with Section 804.7 a. of the Ordinance's setback requirement. Based on our determination that the NMA and its regulations preempt Section 804.7 a.'s setback requirement as applied to the Finishing Building and the Addition, Landowners are entitled to special exceptions to construct both buildings.[15]

Accordingly, we affirm the trial court's determination that the NMA preempts the

14. Based on our determination that the NMA and its implementing regulations preempt the 1500–foot setback requirement expressed in Section 804.7 a. of the Ordinance as applied to the Finishing Building and the Addition, we need not address Landowners' alternative challenges to the validity of the setback requirement or the issue of whether the ZHB erred in denying their request for a dimensional variance for the proposed Addition.

15. The Township also argues the NMA regulations do not preempt the Ordinance's setback requirement because: the NMA's setback reg-

ulations constitute "minimum standards" and municipalities may impose setback requirements that exceed these minimum standards; and, the Ordinance requires a 1500–foot setback from residences and zoning districts while the NMA regulations impose setbacks from water sources and property lines. However, the Township did not raise these issues before the ZHB or the trial court. See N.T. 9/9/03 at 24–45; R.R. at 96a–105a. As such, these issues are waived. See Klein v. Council of the City of Pittsburgh, 164 Pa.Cmwlth. 521, 643 A.2d 1107 (1994).

local setback requirement as applied to the proposed Finishing Building and reverse the trial court's determination that the NMA does not preempt the local setback requirement as applied to the proposed Addition.[16]

### ORDER

AND NOW, this 14th day of July, 2006, the order of the Court of Common Pleas of Berks County is AFFIRMED to the extent it held the Nutrient Management Act preempts the setback requirement in Section 804.7 a. of the Ordinance as applied to the proposed Finishing Building. It is REVERSED to the extent it held the Nutrient Management Act does not preempt the setback requirement in Section 804.7 a. of the Ordinance as applied to the proposed Addition.

## DISSENTING OPINION BY Judge FRIEDMAN.

I respectfully dissent. The majority's holding is that the Nutrient Management Act[1] (NMA) and the regulation at 25 Pa. Code § 83.351 (establishing minimum distances for "manure storage facilities" from property lines and water sources) preempt the setback requirement for "intensive agricultural activities" found in section 804.7(a) of the Richmond Township Zoning Ordinance of 1998 (establishing a minimum distance for "intensive agricultural activities" from other zoning districts and existing residences) (Ordinance). For the following reasons, I disagree.

Stephen R. Burkholder and Darleen G. Burkholder (Landowners) seek to expand their hog raising operation by constructing two new structures: (1) a building to house pigs that have reached the "finishing stage" of the hog raising operation (Finishing Building); and (2) an addition to their "farrowing" and "nursery" building that would allow the Landowners to consolidate those two stages of hog raising in one building (Addition). The Finishing Building would be built over a new manure storage pit; however, the Addition would utilize existing manure storage pits. (Trial ct. op. at 4–5; ZHB's Findings of Fact, Nos. 16–20.)

Section 804.7(a) of the Ordinance provides: "Intensive agricultural activities shall not be located within one thousand five hundred (1,500) feet of another zoning district or existing residence located within the Agriculture or any other zoning district." (R.R. at 159a.) Landowners' new structures would be less than 1,500 feet

---

**16.** In its cross-appeal, the Township asserts the ZHB properly denied Landowners' special exception request because Landowners illegally expanded their use of the Subject Property from an agricultural use to an intensive agricultural use without seeking prior approval. Because Landowners operated unlawfully before seeking approval, the Township argues, the ZHB properly denied their special exception request. This argument fails for two reasons.

First and foremost, the ZHB made no finding of fact or conclusion of law that Landowners' existing use is illegal or unlawful. In addition, contrary to the Township's assertions, the ZHB did not deny Landowners' special exception request on the grounds Landowners conducted their hog raising operation unlawfully prior to seeking the special exception. Rather, the ZHB denied the request based on its determination that Landowners failed to comply with the special exception criteria set forth in Section 804.7 of the Ordinance. More specifically, the ZHB determined Landowners failed to satisfy Section 804.7 a. because its proposed structures did not comply with the 1500–foot setback requirement. *See* ZHB Op. Concls. of Law Nos. 1–6.

**1.** Act of May 20, 1993, P.L. 12, *as amended,* 3 P.S. §§ 1701–1718, commonly referred to as "Act 6." Act 6 was repealed by the Act of July 6, 2005, P.L. 112 (Act 38), and similar language is now codified at 3 Pa.C.S. §§ 501–522.

from zoning district boundaries and/or existing residences. (ZHB's Findings of Fact, No. 21.) Thus, Landowners seek relief from the requirement.

Landowners argue that section 804.7(a) of the Ordinance is preempted by 25 Pa. Code § 83.351 under section 17 of the NMA, which states:

> This act and its provisions are of State-wide concern and occupy the whole field of regulation regarding nutrient management to the exclusion of all local regulations. Upon adoption of the regulations authorized by section 4, no ordinance ... of any political subdivision ... may prohibit or in any way regulate practices related to the storage ... of animal manure ... or to the ... *location* ... of facilities used for storage of animal manure ... *if* the municipal ordinance ... is in *conflict* with this act and the *regulations* promulgated thereunder. Nothing in this act shall prevent a political subdivision ... from adopting and enforcing ordinances ... which are consistent with and no more stringent than the requirements of this act and the regulations promulgated under this act....

3 P.S. § 1717 (emphases added). The regulation at 25 Pa.Code § 83.351 provides minimum standards for the location of new and expanded "manure storage facilities." The regulation states that "manure storage facilities" must be located to prevent the pollution of surface water and groundwater and the offsite migration of pollution.[2] 25 Pa.Code § 83.351(a)(1). The regulation then sets the minimum distances for "manure storage facilities" from perennial streams, rivers, springs, lakes, ponds, reservoirs, private water wells, open sinkholes, active public drinking water wells and surface intakes and property lines; the minimum distances range from 100 feet to 300 feet. *See* 25 Pa.Code § 83.351.

### I. "Manure Storage Facility"

Because 25 Pa.Code § 83.351 pertains to "manure storage facilities," the regulation cannot preempt section 804.7(a) unless Landowners' new structures are "manure storage facilities."

A "manure storage facility" is:

> A permanent structure or facility, or portion of a structure or facility, utilized for the *primary* purpose of containing manure.... Examples include ... component reception pits and transfer pipes [and] containment structures built *under* a confinement building.... The term does not include the animal confinement areas of poultry houses, horse stalls, freestall barns or bedded pack animal housing systems.

25 Pa.Code § 83.201 (emphases added). The word "primary" means "first in ... importance." Webster's Third New International Dictionary 1800 (1993).

### A. Finishing Building

Although the "portion" of the Finishing Building *under* the animal confinement area is a "manure storage facility," the animal confinement area itself is not a "manure storage facility" because its *primary* purpose is not the storage of manure.

---

**2.** The Commonwealth has a duty to protect the environment from private injury through the exercise of its police power, i.e., action taken to protect or preserve the public health, safety and welfare. *C & M Developers, Inc. v. Bedminster Township Zoning Hearing Board,* 573 Pa. 2, 820 A.2d 143 (2002); *Machipongo Land and Coal Company, Inc. v. Department of Environmental Protection,* 569 Pa. 3, 799 A.2d 751 (2002).

### 1. Primary Purpose

The purpose of a finishing building is to house pigs from the time they are eight-to-ten weeks old until they are five-to-six months old, or approximately 250 pounds, and ready for sale. (Trial ct. op. at 3.) Landowners seek to build their new Finishing Building in order to: (1) create a more economic and efficient "all in/all out" operation by eliminating the need to sell any of their pigs as feeder pigs; and (2) improve the health of the pigs by moving them less and by keeping them in clean and dry rooms at all times. (Trial ct. op. at 4.) Given these stated purposes for the Finishing Building, none of which relate to manure storage, I cannot conclude that the *primary* purpose of the Finishing Building is to store manure. Therefore, I cannot conclude that the Finishing Building, *as a whole*, is a "manure storage facility."[3]

### 2. Under a Confinement Building

"[C]ontainment structures built *under* a confinement building" are "manure storage facilities." 25 Pa.Code § 83.201 (emphasis added). In other words, containment structures built under a confinement building are separate and distinct from the confinement building itself. Although the containment structures are "manure storage facilities," the confinement building is *not* a "manure storage facility." This interpretation of "under a confinement building" is consistent with another part of the definition that states that a "manure stor-

age facility" may be a "*portion* of a structure" utilized for the primary purpose of containing manure. *Id.* (emphasis added).

Here, Landowners seek to construct a manure containment structure *under* a confinement building. Pursuant to the definition, the animal confinement building is *not* a "manure storage facility." Only that "portion" of the structure beneath the confinement building utilized for the primary purpose of containing manure is a "manure storage facility."

### 3. Other Animal Confinement Areas Excluded

The majority concludes that the animal confinement area of the Finishing Building is a "manure storage facility" because the definition does not list hog confinement areas in its list of specific exclusions. (Majority op. at 1015.) The definition states that the term "manure storage facility" does *not* include the animal confinement areas of poultry houses, horse stalls, free-stall barns or bedded pack animal housing systems. The majority adopts the view of the trial court that, if the regulation was intended to exclude hog confinement areas from the definition of "manure storage facilities," hog confinement areas would have appeared in this list of specific exclusions. (Majority op. at 1016–17.)

However, it is clear to me that the definition specifically excludes animal confinement areas in poultry houses, horse stalls, freestall barns[4] and bedded pack[5] animal

---

3. The majority states that the primary purpose of the Finishing Building is to "facilitate[] the gathering of the manure" into the "manure storage facility." (Majority op. at 1016.) However, facilitating the gathering of manure is not the same as the storage of manure. No manure at all is actually stored in the confinement area. Moreover, I submit that the majority's understanding of the purpose of the Finishing Building ignores its most important function, i.e., to confine additional pigs so that Landowners can have an "all in/all out" hog raising operation.

4. The Environmental Protection Agency (EPA) defines "Freestalls" as: "Resting cubicles or 'beds' in which dairy cows are free to enter and leave, as opposed to being confined in stanchions or pens." http://www.epa.gov/agriculture/ag101/dairyglossary.html.

5. The EPA defines "Bedded pack" as "Open housing in a barn that is commonly used in conjunction with an outside feeding area." http://www.epa.gov/agriculture/ag101/dairyglossary.html.

housing systems because those types of animal confinement areas do not have separate manure containment structures under them.[6] In poultry houses, etc., the animal manure lies on the floor, so that the manure is "stored" in the same area where the animals are confined. Because the animal manure is *not* kept in a separate place, the confinement area could be construed as a "manure storage facility" absent the specific exclusion. Of course, in hog raising, the confinement areas *do* have separate manure containment structures under them; thus, there was no reason to include hog confinement areas in the list of specific exclusions.

Based on the foregoing, I conclude that the confinement area of the Finishing Building is not a "manure storage facility," and, therefore, the regulation governing the location of "manure storage facilities" does not apply to it. Because the Finishing Building is not a "manure storage facility" subject to 25 Pa.Code § 83.351, section 804.7(a) of the Ordinance may regulate its distance from zoning district lines and existing residences.

### B. The Addition

The ZHB made no finding as to whether the Addition would have a manure storage pit beneath it. The trial court specifically found that the Addition would *not* be built over a manure storage pit but, rather, "would utilize existing storage pits." (Trial ct.'s op. at 4–5.) Based on this finding, the trial court concluded that, inasmuch as "the Addition is being built separate from the pits, it cannot be considered to be primarily utilized for manure containment purposes." (Trial ct.'s op. at 17.) Never-

theless, without any discussion, the majority states, *"Temporary* manure storage would occur in shallow pits directly below the Addition." (Majority op. at 1009) (emphasis added). I point out that, as an appellate court, we may not make our own findings of fact.

Nonetheless, the majority is correct that, according to the record, the Addition would be built over "a reception pit which is connected by a transfer pipe to the actual manure storage [facility]," (R.R. at 280a), and, if there had been such a finding, there would be no question that "component reception pits and transfer pipes" fall within the definition of "manure storage facility."[7] However, because the trial court found that its primary purpose would be "the furrowing and weaning of young piglets," *not* the containing of manure, the confinement area of the Addition would *not* fall within the definition. (Trial ct.'s op. at 17.)

Based on the foregoing, I conclude that the confinement area of the Addition is not a "manure storage facility," and, thus, the regulation governing the location of "manure storage facilities" does not apply to it. Because the Addition is not a "manure storage facility" subject to 25 Pa.Code § 83.351, section 804.7(a) of the Ordinance may regulate its distance from zoning district lines and existing residences.

### II. No Conflict with the Regulation

Even if the confinement areas of the Finishing Building and Addition were themselves "manure storage facilities," I perceive no conflict between 25 Pa.Code

---

**6.** Neither the majority nor the trial court has cited evidence that, in poultry houses, horse stalls, freestall barns and bedded pack animal housing systems, a manure containment structure is usually built under the animal confinement area.

**7.** I note that the 100–to–300–foot minimum distance requirements in the regulation do not apply to reception pits and transfer pipes. *See* 25 Pa.Code §§ 83.351(a)(2)(iv) & (v).

§ 83.351 and section 804.7(a) of the Ordinance.

The regulation at 25 Pa.Code § 83.351 requires that "manure storage facilities" be located, at a *minimum,* 100–to–300 feet from property lines and specified water sources. Section 804.7(a) of the Ordinance requires that "intensive agricultural activities" be located 1,500 feet from zoning district lines or existing residences. Because section 804.7(a) pertains only to the distance of an "intense agricultural activity" from zoning district lines and existing residences, *not* the distance of "manure storage facilities" from water sources and property lines, I submit that section 804.7(a) does not even apply to "manure storage facilities." [8]

The majority concludes that section 804.7(a) of the Ordinance must conflict with the regulation because Landowners have complied with the manure storage regulation but still are precluded from expanding their hog-raising operation due to failure to comply with section 804.7(a) of the Ordinance. However, the majority's position suggests that *any* restriction on the location of an activity involving a "manure storage facility" is preempted by the NMA and the regulation. Indeed, the majority has removed any distinction between a "manure storage facility" and the activity requiring one. Thus, the majority would allow a landowner to locate a hog-raising operation *anywhere* that is within 100–to–300 feet of property lines and the specified water sources.[9]

However, the agency that promulgated 25 Pa.Code § 83.351, i.e., the State Conservation Commission (Commission), has published a Best Management Practices Manual for Livestock and Poultry Operations in Pennsylvania (Manual), which states:

> The authority for determining the siting of particular *land uses* in Pennsylvania, including the siting of animal production facilities, lies with local government.... Operators proposing to build facilities should check with the local municipality to determine if they have *zoning or other land use ordinances that direct where animal production facilities may or may not be sited* .... These zoning requirements often designate appropriate areas for agricultural operations, such as large animal production facilities, to assure that they can integrate well into the existing and planning community.

http://www.agriculture.state.pa.us/agriculture/lib/ agriculture/pasccfiles/nutrientmanagement/bmp—manual.pdf; (Manual at 5) (emphasis added).

Following the agency's construction of its own regulation, I suggest that landowners who are planning to conduct animal raising operations must comply with local zoning ordinances that govern the *permitted uses of land.* Once a landowner has identified where animal raising operations are permitted, the landowner then must comply with the requirements in 25 Pa. Code § 83.351 with respect to "manure storage facilities" located *within the per-*

---

**8.** If section 804.7(a) did pertain to "manure storage facilities" and their distance from property lines and water sources, the ordinance would be consistent with the regulation because the regulation establishes *minimum* standards and because 1,500 feet is greater than 100–to–300 feet. Section 804.7(a) would be more stringent than the regulation because it would require that "manure storage facili-

ties" be located further than 100–to–300 feet from property lines and water sources.

**9.** Because the minimum distances requirements in 25 Pa.Code § 83.351 do not apply to reception pits and transfer pipes, a landowner using them for manure management could locate a hog-raising operation *anywhere.*

*mitted area.* Here, section 804.7(a) of the Ordinance permits the use of land for "intensive agricultural activities" within the rural-agricultural district and 1,500 feet from other zoning districts and existing residences. Thus, Landowners must locate their hog-raising operation within that permitted area, and any "manure storage facilities" within that permitted area must be 100–to–300 feet from property lines and water sources.

Based on the foregoing, I would reverse the trial court to the extent it concluded that 25 Pa.Code § 83.351 preempts section 804.7(a) of the Ordinance with respect to the Finishing Building. I would affirm the trial court to the extent it concluded that 25 Pa.Code § 83.351 does not preempt section 804.7(a) of the Ordinance with respect to the Addition.

Judge PELLEGRINI joins in this dissent.