**COMMONWEALTH of Pennsylvania, OFFICE OF ATTORNEY GENERAL By Thomas W. CORBETT, Jr., Attorney General, Plaintiff**

v.

**RICHMOND TOWNSHIP, and Richmond Township Board of Supervisors, Defendants.**

Commonwealth Court of Pennsylvania.

Decided May 28, 2010.
Publication Ordered Aug. 10, 2010.

Susan L. Bucknum, Sr. Deputy Attorney General and Susan J. Forney, Chief Deputy Attorney General, Harrisburg, for plaintiff.

Anthony R. Sherr, Blue Bell, for defendants.

OPINION BY Senior Judge FRIEDMAN.

The Commonwealth of Pennsylvania, Office of Attorney General By Thomas W. Corbett, Jr., Attorney General (Attorney General), has filed a motion for summary judgment (Motion) in connection with his "Amended Petition for Review in the Nature of a Complaint for Declaratory Judgment and Injunctive Relief" (Petition), which the Attorney General filed in this

court's original jurisdiction pursuant to section 315 of the Agriculture Code [1] (Code) against Richmond Township and the Richmond Township Board of Supervisors (together, Township). We grant the Motion and enter summary judgment in favor of the Attorney General.

This court may enter summary judgment at any time after the filing of a petition for review in our original jurisdiction if the applicant's right to relief is clear. Pa. R.A.P. 1532(b). Under Pa. R.C.P. No. 1035.2(2), a court may enter summary judgment if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

 Oral testimony of the moving party or his witnesses, by itself, even if uncontradicted, is generally insufficient to establish the absence of a genuine issue of material fact. Pa. R.C.P. No. 1035.2, *Note* (citing *Nanty–Glo v. American Surety Co.*, 309 Pa. 236, 163 A. 523 (1932), and *Penn Center House, Inc. v. Hoffman*, 520 Pa.

171, 553 A.2d 900 (1989)). Oral testimony that constitutes an adverse admission by a non-moving party does not fall within this rule.[2] *Department of Environmental Resources v. Bryner*, 149 Pa.Cmwlth. 59, 613 A.2d 43 (1992).

## I. Count I

The Attorney General argues that the Township violated section 313 of the Code [3] by enforcing sections 201.4 and 804.7 of the Township's Zoning Ordinance (Ordinance), which relate to intensive agriculture. The Attorney General contends that the definition of "intensive agriculture" in those provisions is arbitrary, vague and unreasonable and invites discriminatory enforcement. We agree.

 A local government unit has no authority to adopt an ordinance that is arbitrary, vague or unreasonable or inviting of discriminatory enforcement. *Exton Quarries, Inc. v. Zoning Board of Adjustment*, 425 Pa. 43, 228 A.2d 169 (1967). A vague ordinance is one that proscribes activity in terms so ambiguous that reasonable persons may differ as to what is actually prohibited. *Scurfield Coal, Inc. v. Commonwealth*, 136 Pa.Cmwlth. 1, 582 A.2d 694 (1990).

**1.** 3 Pa.C.S. § 315. Section 315 of the Code authorizes the Attorney General to bring an action against a local government unit in Commonwealth Court to invalidate an unauthorized local ordinance or enjoin the enforcement of an unauthorized local ordinance. *Id.* An "unauthorized local ordinance" is an ordinance that does any of the following:

(1) Prohibits or limits a normal agricultural operation unless the local government unit:
　(i) has expressed or implied authority under State law to adopt the ordinance; and
　(ii) is not prohibited or preempted under State law from adopting the ordinance.
(2) Restricts or limits the ownership structure of a normal agricultural operation.
Section 312 of the Code, 3 Pa.C.S. § 312.

**2.** The Township contends that the Attorney General improperly relies upon the deposition testimony of John E. Yoder, the Township's zoning officer, to establish the absence of a genuine issue of material fact. (Township's brief at 3–4.) However, Yoder was deposed as an agent of the Township. (Yoder dep. at 7.) Moreover, Yoder testified that his duties as a zoning officer include interpreting the meaning and applicability of the Township's zoning ordinance (Ordinance). (Yoder dep. at 15.) Thus, Yoder's testimony constitutes an admission by the Township as to the meaning and applicability of the Ordinance.

**3.** 3 Pa.C.S. § 313. Under section 313 of the Code, a local government unit shall not enforce an existing unauthorized local ordinance. *Id.*

## A. Statutory Construction

■ Section 201.4 of the Ordinance defines "Agriculture (Intensive)" as "[s]pecialized agricultural activities including, but not limited to, mushroom production, poultry production, and dry lot livestock production, **which due to the intensity of production, necessitate development of specialized sanitary facilities and control.**" (Petition, ex. A at 3) (emphasis added). Section 804.7 provides, in pertinent part, that "[i]ntensive agricultural activities include, but are not limited to, mushroom farms, poultry and egg production, and dry lot farms, wherein the character of the activity involves a **more intense use of the land than found in normal farming operations.**" (Petition, ex. A at 114) (emphasis added).

Because these provisions relate to the same thing, *viz.,* the meaning of intensive agriculture, we shall read them *in pari materia.* Section 1932 of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1932. Moreover, in reading the provisions, we shall construe the words and phrases according to the rules of grammar and their common and approved usage. Section 1903(a) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1903(a).

First, the definition in section 201.4 indicates that intensive agriculture involves "specialized" agricultural activities. This means that intensive agriculture is agriculture that is designed for a particular end, e.g., producing mushrooms, poultry, eggs or dry lot livestock. *See* Webster's Third New International Dictionary 2186 (2002) (defining "specialized"). Second, the "intensity" of the production must be greater than that found in normal farming operations. This means that there must be an "extreme degree" of production. Webster's Third New International Dictionary 1175 (2002) (defining "intense" and "intensity"). Third, production is not extreme enough to be included within the definition unless it requires the "development of specialized" sanitary facilities and control. This means that normal sanitary facilities and control will not suffice and that someone must make sanitary facilities and control "usable or available" for the degree of production. Webster's Third New International Dictionary 618 (2002) (defining "development").

Ultimately, then, whether a farming operation falls within the definition of intensive agriculture in the Ordinance depends on whether it requires the farmer to use "specialized sanitary facilities and control." The Ordinance does not define these terms. To the extent that reasonable persons may differ as to their meaning, and the definition of intensive agriculture, the Ordinance would be ambiguous and could not stand. In order to make that determination, we consider the deposition testimony of John E. Yoder, the Township's zoning officer, regarding his understanding of the terms "specialized sanitary facilities and control."

## B. Specialized Sanitary Facilities and Control

Yoder is responsible for making the initial determination as to whether a farming operation falls within the definition of intensive agriculture. Yoder testified that, in construing the Ordinance's definition of intensive agriculture, he separates sanitary facilities from controls. (Yoder dep. at 41, 88.)

With respect to sanitary facilities, Yoder testified that: (1) sanitary facilities include manure pits and compost areas, both of which deal with waste products, but he does not know "the difference between a sanitary facility for [a normal] agriculture operation versus an intensive operation," (Yoder dep. at 43–44); and (2) a sanitary facility would be "specialized" if the opera-

tion generated so much manure or compost that the farmer could not use it all on his property, so that he needed to store it in a "facility of greater magnitude than . . . [a storage facility in] a normal agricultural operation" before trucking it somewhere else to be sold, (Yoder dep. at 46).

With respect to the word "control" in the definition, Yoder testified that the term includes: (1) noise, rodent and insect controls, but such controls would be the same for both normal and intensive agriculture, (Yoder dep. at 80–85); (2) water pollution control, but a nutrient management plan would sufficiently address that concern in both normal and intensive agriculture, (Yoder dep. at 84–85); (3) bringing specialized animal feed from outside the farm, but that would not make a farming operation intensive agriculture without a large number of animals, although "I don't have a set number," (Yoder dep. at 37–39); (4) needing to "suit up" when entering a sanitary facility to prevent the spread of disease, (Yoder dep. at 41); and (5) restricting access to a building, (Yoder dep. at 41–42). Yoder further testified that, in order to determine whether a control is "specialized" for a particular agricultural operation, he "would have to familiarize [himself] with [normal controls]." (Yoder dep. at 42.)

Considering Yoder's testimony about specialized sanitary facilities and control, reasonable people may differ as to what actually falls within the definition of intensive agriculture. As for specialized sanitary facilities, Yoder admitted that he could not explain the difference between sanitary facilities used in normal agriculture and those used in intensive agriculture. Yoder thought that a larger-than-normal storage facility for manure or compost would be "specialized," but Yoder did not testify regarding the dimensions of a normal storage facility, and, even if he had

done so, they are not found in the Ordinance. Thus, no one could know the dimensions of a larger-than-normal sanitary facility from the Ordinance.

As for specialized controls, Yoder conceded that many controls are the same for both normal and intensive agriculture. Yoder also conceded that nutrient management plans for both normal and intensive agriculture are sufficient to control water pollution; thus, there would be no need to impose further controls under the Ordinance. Yoder gave other examples of controls, but Yoder stated that he could not identify a specialized control without investigating what is normal for a particular farming operation. Thus, no one else could know what sort of control would place a farming operation within the definition of intensive agriculture without investigating normal controls **and** reaching the same conclusion as Yoder.

Based on the foregoing, we agree with the Attorney General that the Ordinance fails to provide any guidance as to how the Township determines when activities associated with a normal agricultural operation intensify to the level that they transform into an intensive agricultural activity. We also agree that, because a person cannot read the Ordinance and ascertain whether a particular agricultural activity would be considered intensive agriculture, the Ordinance is vague and ambiguous. We further agree that, because enforcement of the Ordinance depends solely upon the subjective determination of Township officials, the Ordinance invites discriminatory enforcement.

Accordingly, with respect to Count I, we enter summary judgment in favor of the Commonwealth. Because the definition of intensive agriculture in the Ordinance does not draw a clear distinction between intensive agriculture and normal agriculture, the Township is enjoined from enforcing

the restrictions in the Ordinance relating to intensive agriculture.

## II. Count II

The Attorney General argues that the limits on intensive agriculture in section 804.7 of the Ordinance are preempted by state law. More specifically, the Attorney General asserts that: (1) the 1,500–foot setback requirement is inconsistent with and preempted by the act known as the Nutrient Management Act (NMA);[4] (2) the prohibition on commercial composting and the limitation on on-site composting is more stringent than the NMA's regulations; and (3) the requirement that solid and liquid wastes be disposed of on a daily basis conflicts with the NMA's regulations, which require disposal of solid and liquid wastes on a seasonal basis.[5]

 A municipal ordinance cannot be sustained to the extent that it is contradictory of, or inconsistent with, a state statute. *Burkholder v. Zoning Hearing Board,* 902 A.2d 1006 (Pa.Cmwlth.2006). State statutes may address the issue of preemption by: (1) expressly specifying that municipalities may enact ordinances which are not inconsistent with the state law and which promote the state law's purpose; (2) expressly forbidding municipal legislation; or (3) being silent on the issue while regulating an industry or occupation. *Id.*

In this case, section 519 of the NMA provides:

> (a) General.—This chapter and its provisions are of Statewide concern and occupy the whole field of regulation regarding nutrient management and odor management, **to the exclusion of all local regulations.**

> (b) Nutrient management.—**No ordinance** or regulation of any political subdivision or home rule municipality **may** prohibit or **in any way regulate** practices related to the storage, **handling** or land application of animal manure or nutrients **or to the** construction, **location** or operation **of facilities used for storage of animal manure or nutrients or practices otherwise regulated by this chapter if the municipal ordinance** or regulation **is in conflict with this chapter and the regulations or guidelines promulgated under it.**

> (c) Odor management.—No ordinance or regulation of a political subdivision or home rule municipality may regulate the management of odors generated from animal housing or manure management facilities regulated by this chapter if the municipal ordinance or regulation is in conflict with this chapter and the regulations or guidelines promulgated under it.

> (d) Stricter requirements.—Nothing in this chapter shall prevent a political subdivision or home rule municipality from adopting and enforcing ordinances or regulations which are **consistent with**

---

4. 3 Pa.C.S. §§ 501–520.

5. Section 804.7 of the Ordinance limits intensive agriculture as follows:

 a. Intensive agricultural activities shall not be located within one thousand five hundred feet (1,500) of another zoning district or existing residence located within the Agriculture or any other zoning district.
 
 . . . .
 
 c. Commercial composting is prohibited. Any on-site composting shall be limited for use on the premises on which such composting is made and produced.
 
 d. Solid and liquid wastes shall be disposed of daily in a manner to avoid creating insect or rodent problems, or a public nuisance. No emission of noxious, unpleasant gases shall be permitted in such quantities as to be offensive outside the lot lines of the tract occupied by an intensive agricultural user.

 (Petition, ex. A at 114.)

**and no more stringent** than the requirements of this chapter and the regulations or guidelines promulgated under this chapter. No penalty shall be assessed under any such local ordinance or regulation under this subsection for any violation for which a penalty has been assessed under this chapter.

3 Pa.C.S. § 519 (emphasis added).

### A. 1500–Foot Setback

■ Section 804.7.a of the Ordinance prohibits intensive agriculture within one thousand five hundred feet (1,500) of another zoning district or existing residence located.

However, in *Burkholder*, we held that this 1500–foot setback was preempted by NMA regulations to the extent the Township applied it to a manure storage facility. This court pointed out that the most stringent setback requirement for a manure storage facility in the NMA regulations is 300 feet. Thus, this court concluded that the 1500–foot setback conflicts with, and is more stringent than, the setbacks imposed by the NMA regulations. *Burkholder*. Relying on *Burkholder*, we now hold that the 1500–foot setback is preempted by the NMA regulations to the extent that the Township applies the 1500–foot setback to any facility covered by the regulations.

### B. Composting Restrictions

■ Section 804.7.c of the Ordinance prohibits commercial composting and limits the use of on-site composting to the premises where it is made and produced.

One purpose of the NMA is to establish **nutrient management** planning requirements for certain agricultural operations which generate or utilize animal manure. Section 502(1) of the NMA, 3 Pa.C.S. § 502(1). The term "nutrient" is statutorily defined to include "livestock and poultry manures, compost as fertilizer . . . or com-

binations thereof." Section 503 of the NMA, 3 Pa.C.S. § 503. The words "manure management facility" are defined to include "composting facilities." *Id.* As Yoder testified, a farmer may dispose of manure by putting it in a composting area. (Yoder dep. at 60–70.) When a farmer has added "manure" to "compost," the laws governing "manure" necessarily pertain to the "compost."

The NMA regulations allow manure to be exported from an agricultural operation. Indeed, nutrient management plans must include the "total amount of manure planned to be exported from the operation annually." 25 Pa.Code § 83.282(a)(1)(iii). Moreover, when a farmer exports manure, the farmer may involve a commercial manure hauler, a manure broker and a marketing scheme. 25 Pa.Code § 83.301(d), (e) & (h). Clearly, then, the NMA regulations permit manure, and compost containing manure, to be sold. To the extent that section 804.7.c of the Ordinance conflicts with the regulations in this regard, the regulations preempt the Ordinance.

Accordingly, we enter summary judgment in favor of the Attorney General on this issue. The Township is enjoined from enforcing the prohibition on commercial composting and the limitation on off-site compost use to the extent that the compost contains manure.

### C. Daily Disposal of Wastes

■ Section 804.7.d of the Ordinance requires that solid and liquid wastes shall be disposed of daily. Yoder testified that this provision requires a farmer to clean up and dispose of manure every day by either applying it to fields or putting it in a manure pit or composting area. (Yoder dep. at 69–71, 170–71.)

However, the regulation at 25 Pa.Code § 83.294, which governs the application of manure to fields, states that nutrients

"shall be applied to fields during times and conditions that will hold the nutrients in place for crop growth, and protect surface water and groundwater. . . ." The regulation does **not** require daily field application.

Moreover, the regulation at 25 Pa.Code § 83.311, which governs the management of manure, does not require farmers to clean up animal manure every day. In fact, the regulation indicates that manure may accumulate in animal concentration areas, 25 Pa.Code § 83.311(c)(3). To the extent that section 804.7.d requires daily cleaning to prevent storm water runoff from contaminating water sources with manure, the regulation requires that animal concentration areas be designed to eliminate that possibility, 25 Pa.Code § 83.311(c)(1). To the extent that section 804.7.d requires manure storage as an alternative to field application, the regulation does not even require the construction of manure storage facilities unless it is necessary to protect water sources. 25 Pa.Code § 83.311(d)(1). Thus, in various ways, section 804.7.d of the Ordinance conflicts with the NMA regulation on manure management.

Accordingly, we enter summary judgment in favor of the Attorney General on this issue. The Township is enjoined from enforcing section 804.7.d of the Ordinance.

### III. Count III

The Attorney General argues that the prohibition on commercial composting in section 804.7.c of the Ordinance is inconsistent with section 2352 of the Domestic Animal Law [6] (Animal Law) and is preempted pursuant to section 2389 of the Animal Law.[7] We agree.

**6.** 3 Pa.C.S. § 2352.

**7.** 3 Pa.C.S. § 2389.

Section 2352(a)(4)(iii) of the Animal Law states that composting is a permissible method for the disposal of dead domestic animals and animal waste. The provision does **not** prohibit commercial composting. Section 2389 of the Animal Law states, in relevant part, that "[t]his chapter and its provisions are of Statewide concern and shall have eminence over any ordinances . . . which pertain to . . . the procedure for the disposal of dead domestic animals and domestic animal waste." 3 Pa.C.S. § 2389. Thus, section 2352(a)(4)(iii) of the Animal Law has eminence over section 804.7.c of the Ordinance with regard to the composting of dead domestic animals and animal waste.

Accordingly, we enter summary judgment in favor of the Attorney General on this issue. The Township is enjoined from enforcing the prohibition on commercial composting in section 804.7.c of the Ordinance to the extent that the compost contains the bodies of dead domestic animals and animal waste.

### IV. Count IV

The Attorney General argues that section 804.7 of the Ordinance restricts agricultural operations in violation of section 603 of the Pennsylvania Municipalities Planning Code (MPC).[8] We agree.

Section 603(b) of the MPC permits the enactment of zoning ordinances, **except** to the extent that regulation of activities related to commercial agricultural production would exceed the requirements imposed under: (1) the NMA, regardless of whether an agricultural operation within the area covered by the ordinance would be a concentrated animal operation as defined by the NMA; (2) the Agricultural

**8.** Act of July 31, 1968, P.L. 805, *as amended,* 53 P.S. § 10603.

Area Security Law (AASL);[9] or (3) the act known as the Right to Farm Law (RFL).[10]

Section 603(h) of the MPC provides:

Zoning ordinances shall encourage the continuity, development and viability of agricultural operations. Zoning ordinances may not restrict agricultural operations or changes to or expansions of agricultural operations in geographic areas where agriculture has traditionally been present unless the agricultural operation will have a direct adverse effect on the public health and safety. **Nothing in this subsection shall require a municipality to adopt a zoning ordinance that violates or exceeds the provisions of the [NMA], the [AASL], or the [Right to Farm Law].**[11]

53 P.S. § 10603(h) (emphasis added).

We concluded above that section 804.7 of the Ordinance conflicts with the NMA. On that basis alone, we can conclude that section 804.7 of the Ordinance violates section 603 of the MPC. Accordingly, we enter summary judgment in favor of the Attorney General on this issue. The Township is enjoined from enforcing section 804.7 of the Ordinance on this basis.

## V. Count V

The Attorney General argues that section 804.7 of the Ordinance unreasonably restricts farm structures and farm practices in violation of section 911 the AASL.[12] We agree.

Section 11(a) of the AASL requires that every municipality that creates an agricultural security area shall encourage the continuity, development and viability of agriculture within the area by not enacting ordinances which would unreasonably restrict **farm structures or farm practices** within the area, unless such restrictions bear a direct relationship to the public health or safety. 3 P.S. § 911(a).

Section 804.7.a of the Ordinance restricts the location of manure storage facilities, which are farm structures, by requiring a 1500–foot setback from other zoning districts and residences. The restriction is unreasonable when one considers that the maximum setback in the NMA regulations is 300 feet. The restriction is not related to the public health or safety because, as a matter of law, an agricultural operation complying with the NMA is not a threat to the public health or safety. 53 P.S. § 10603(h); *Commonwealth v. Richmond Township*, 975 A.2d 607 (Pa.Cmwlth.2009) (*Richmond I* ).

Section 804.7.c of the Ordinance restricts composting, which is a farm practice, by prohibiting commercial composting and the exportation of compost for use elsewhere. The restrictions are unreasonable considering that NMA regulations allow these practices. The restrictions are not related to the public health or safety because, as a matter of law, an agricultural operation complying with the NMA is not a threat to the public health and safety. *Id.*

Accordingly, we enter summary judgment in favor of the Attorney General on

---

9. Act of June 30, 1981, P.L. 128, *as amended,* 3 P.S. §§ 901–915.

10. Act of June 10, 1982, P.L. 454, *as amended,* 3 P.S. §§ 951–957.

11. As we noted in *Commonwealth v. Richmond Township*, 975 A.2d 607 (Pa.Cmwlth. 2009), the bolded language indicates that, as

a matter of law, an agricultural operation complying with the NMA, AASL and the RFL does not constitute an operation that has a direct adverse effect on the public health and safety.

12. 3 P.S. § 911.

this issue. The Township is enjoined from enforcing section 804.7 on this basis.

## VI. Count VI

■ The Attorney General argues that section 804.7.d of the Ordinance violates section 3(a) of the RFL.[13] We agree.

Section 3(a) of the RFL requires that municipalities prohibiting public nuisances exclude normal agricultural operations so long as the operations do not have a direct adverse effect on the public health and safety. 3 P.S. § 953(a). Section 804.7.d of the Ordinance requires that solid and liquid wastes be disposed of daily in a manner to avoid creating a public nuisance.

In *Richmond I,* this court concluded that section 804.7.d is a *de facto* nuisance ordinance that defines "public nuisance" as the failure to dispose of solid and liquid wastes on a daily basis. This court then stated that section 804.7.d would violate section 3(a) of the RFL if a normal agricultural operation does not require daily disposal of solid and liquid wastes.

In this regard, the Attorney General has submitted the undisputed expert report of Gregory P. Martin, Ph.D., PAS.[14] In his report, Dr. Martin stated that requiring the daily removal of waste from a poultry operation would preclude poultry production for meat. (AG exhibits, ex. 34 at 10.) He explained:

> In poultry operations specifically, vermin, including house flies and mice, are generally not found in large numbers.... Little fly breeding occurs because of the dry litter. Since birds are

continually stirring the litter with their feet and supplemental heat is added to the houses early, the litter is maintained in a very dry state, below the levels needed for proper house fly larva growth.... By requiring daily litter removal, additional flies, wild birds and mice from the outside would come in to inhabit the building. Heat for young birds and nursery livestock could not be well maintained in this method of production. This is not good and contrary to a disease prevention/biosecurity standpoint.

(*Id.,* footnotes omitted.) Dr. Martin's undisputed report establishes that daily disposal of wastes is not part of normal poultry operations; in fact, the report establishes that daily disposal of wastes is harmful to such operations. Based on this fact, we conclude that section 804.7.d of the Ordinance violates section 3(a) of the RFL.

Accordingly, we enter summary judgment in favor of the Attorney General on this issue. The Township is enjoined from enforcing section 804.7.d of the Ordinance on this basis.

## *ORDER*

AND NOW, this 28th day of May, 2010, the motion for summary judgment filed by the Commonwealth of Pennsylvania, Office of Attorney General By Thomas W. Corbett, Jr., Attorney General, is granted. Richmond Township (Township) and the Richmond Township Board of Supervisors

---

**13.** 3 P.S. § 953(a).

**14.** The Township contends that the Attorney General's reliance on Dr. Martin's expert report is improper because the Attorney General failed to disclose or produce the report during discovery. (Township's brief at 3 n. 2.) However, the Attorney General properly notes that the Township was required to use interrogatories to discover the identity of any experts. *See* Pa. R.C.P. No. 4003.5(a)(1). Moreover, under Pa. R.C.P. No. 1035.1, the summary judgment record includes a report signed by an expert witness that would, if filed, comply with Rule 4003.5(a)(1), whether or not the report has been produced in response to interrogatories.

are hereby enjoined from enforcing the provisions of the Township Zoning Ordinance relating to intensive agriculture.