**Barbara A. WALCK and Edgar F. Lorah, Jr., Appellants**

v.

**LOWER TOWAMENSING TOWNSHIP ZONING HEARING BOARD and Lower Towamensing Township.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Dec. 11, 2007.
Decided Jan. 18, 2008.

---

Stacey L. Morgan, Lancaster, for appellants.

Holly A. Heintzelman, Lehighton, for appellee, Lower Towamensing Township Zoning Hearing Board.

James R. Nanovic, Jim Thorpe, for appellee, Lower Towamensing Township.

BEFORE: SMITH–RIBNER and SIMPSON, Judges, and FLAHERTY, Senior Judge.

OPINION BY Judge SIMPSON.

In this land use appeal, we consider whether the Nutrient Management Act (NMA)[1] and its attendant regulations preempt enforcement of a local zoning ordinance regarding the long-term stockpiling of a large quantity of sewage sludge on a farming operation. In particular, Barbara A. Walck (Walck),[2] and Edgar F. Lorah, Jr. (Lorah) (collectively, Applicants) assert the Lower Towamensing Township Zoning Hearing Board (ZHB) erred in upholding an enforcement notice issued by the Township Zoning Officer requiring them to cease the long-term stockpiling of sewage sludge on their property. We hold the NMA does not preempt enforcement of the local zoning ordinance in this case.

The facts, as found by the ZHB, may be summarized as follows. Walck is the legal owner of the property located at 1535 Lower Smith Gap Road, Kunkletown, Lower Towamensing Township (subject property). Lorah leases the subject prop-

---

1. Act of May 20, 1993, P.L. 12 No. 6, *as amended, formerly* 3 P.S. §§ 1701–1718, commonly referred to as "Act 6." Act 6 was repealed by the Act of July 6, 2005, P.L. 112, No. 38 (Act 38); similar language is now codified at 3 Pa C.S. §§ 501–522. Here, the Township issued its enforcement notice on July 26, 2005; thus, the 2005 version of the NMA (Act 38), which became effective immediately on July 6, 2005, applies here. In addition, references to the NMA's implementing regulations in this opinion are to the regulations effective as of the issuance of the Township's enforcement notice.

2. Walck, acting through her power of attorneys, Judy Walck and Jerry Walk.

erty from Walck as part of his farming operation. The subject property lies in the Township's R–1 Low Density Residential Zoning District.

Section 432 of the Lower Towamensing Township Zoning Ordinance of 1978 (Ordinance) sets forth the uses permitted by right in the R–1 district. "Agriculture" is a permitted use in an R–1 district subject to certain restrictions. One such restriction states "intensive agricultural activities are prohibited." Section 432(5)(b) of the Ordinance.

Section 201 of the Ordinance defines "agriculture" as, among other things, the cultivation of the soil and the raising and harvesting of the products of the soil, including nursery and horticulture, but excluding forestry. Intensive agriculture is defined as specialized agricultural activities including, but not limited to, mushroom, poultry and dry lot livestock production, which due to the intensity of production or raw material storage needs, necessitates special control of operation, raw material storage and processing, and disposal of liquid and solid wastes. *Id.*

The Township received numerous complaints regarding sewage sludge stockpiling on the subject property. Based on the complaints, the Township Zoning Officer inspected the subject property in June and July 2005 and several other times thereafter. The Zoning Officer observed a large stockpile of sewage on the subject property. In late July 2005, the Zoning Officer issued an enforcement notice against Walck alleging violations of Section 432 and Section 519 of the Ordinance.[3] The enforcement notice required Walck to cease using the subject property for the storing, dumping and stockpiling of solid waste. The notice further required Walck

to remove or plow the waste located on the subject property within 10 days.

Shortly thereafter, Lorah filed an appeal from the enforcement notice with the ZHB. A hearing ensued before the ZHB in late October 2005. At the hearing, the Township Zoning Officer testified he observed a stockpile of solid waste on the subject property approximately 20 or 30 feet in width, 40 or 50 feet in depth, and 8 or 10 feet in height. The Zoning Officer admitted he had no knowledge of the composition of the materials stored on the subject property.

The Township also presented the testimony of Bill Wetzel, a nearby landowner, who explained there was a terrible smell in his neighborhood in June 2005. He testified he was unable to hold outdoor parties during the summer or sit outside due to the smell. Wetzel testified the smell lessened in August 2005.

In support of Applicants' appeal, Lorah testified the subject property is used exclusively for the cultivation of the soil. He explained he has corn and hay planted on the subject property. Lorah testified he received a delivery of sewage sludge from Synagro Mid Atlantic, Inc. in May/June 2005, and he used approximately half of the material on his fields. The balance of the sludge (approximately 100 tons) remained stockpiled on the subject property as of the ZHB hearing in late October 2005. Lorah testified he intended to use the balance of the sludge sometime in the fall, but he had no specific date when the material would be spread on the fields.

Applicants also presented the testimony of Mark Reider, senior technical service manager of Synagro Mid Atlantic, who the ZHB recognized as an expert in soil sci-

---

3. Section 519 of the Ordinance states, to the extent agricultural activities are permitted in the Township, such activities may not be conducted in a manner that creates a definite danger to the health or safety of neighboring uses.

ence. Reider explained Synagro delivered 360 tons of sewage sludge to the subject property. He testified the sewage sludge stored on the subject property consisted of treated municipal sewage sludge, also known as Class A Biosolids, from the Valley Forge Sewer Authority. The materials also consisted of food processing waste, also known as slaughterhouse manure, from the Hatfield Meat Company. Reider explained the amount of waste delivered to the subject property is based on his calculations of the agronomic rates for the upcoming growing season. During his testimony, Reider used a spreadsheet (that was admitted into evidence) that contained an analysis of the materials delivered to Lorah. Reider testified the document was prepared as an "in-house" document, but was generated to the same standards required by the NMA. Reproduced Record (R.R.) at 51a. However, he further explained "[i]t's not required that I submit [this document] to the [s]tate." *Id.* Reider further testified he does not, as part of his regular practice, consult local zoning ordinances because he believes application of the nutrients Synagro provides is regulated by the NMA.

Based on the evidence presented, the ZHB issued an opinion and order sustaining the enforcement notice and denying Applicants' appeal. The ZHB determined Lorah stockpiled more than 100 tons of sewage sludge on the subject property from May/June 2005 through October 2005. It determined the stockpiling of sewage sludge cannot be considered agriculture or cultivation of the soil. Rather, the ZHB stated such activity is simply the stockpiling of solid waste, which is not a permitted use in an R–1 district and which is prohibited as intensive agriculture. The ZHB stated Section 432(5)(b) of the Ordinance prohibits specialized agricultural activities that require intense raw material storage needs in an R–1 district. Thus, the ZHB concluded the storage of more than 100 tons of sewage sludge for approximately five months is raw material storage that is beyond the purview of normal farming activity.

The ZHB also rejected Applicants' argument that the NMA preempted the Ordinance. It first observed both the NMA and its regulations state nothing in the NMA prevents a municipality from adopting and enforcing ordinances or regulations that are consistent with and no more stringent than the requirements of the NMA and its regulations. The ZHB then stated:

The ... [NMA] provide[s] that a management plan is mandatory for all operators of a concentrated animal operation [(CAO)].[4] [Section 506(b) of the NMA, 3 Pa.C.S. § 506(b)]. In the case at bar, Lorah testified that he has no animals on the [subject] property. He testified his farming on the [subject] property in 2005 was limited to hay and corn. Therefore, Lorah is not mandated to have the Nutrient Management Plan and the [NMA] does not apply.

However, [Section 506(h) of the NMA, 3 Pa.C.S. § 506(h)] provides that any agricultural operation which is not a CAO may voluntarily develop a Nutrient Management Plan and have it reviewed

4. Regulations attendant to the NMA define a CAO as an agricultural operation "where the animal density exceeds two AEUs per acre on an annualized basis." 25 Pa.Code § 83.201. In turn, an "AEU" is an "animal equivalent unit," which is defined as "[o]ne thousand pounds live weight of livestock or poultry animals, regardless of the actual number of individual animals comprising the unit." *Id.* In addition, an "AEU per acre" is defined as "[a]n animal equivalent unit per acre of cropland or acre of land suitable for application of animal manure." *Id.*

pursuant to the [NMA]. While it was implied that Lorah had a nutrient management plan, neither Synagro, nor Lorah, submitted an approved plan to the [ZHB]. 25 Pa.Code § 83.392 relating to volunteer plans provides that procedures and provisions for the utilization or proper disposal of excess manure must be contained in the summary of the plan. Said code section further provides that manure management and storage practices, and storm water runoff control practices may be referenced in the summary but shall be covered by the appropriate section of the plan. No such information was provided to the [ZHB].

The regulations (25 Pa.Code § 83.404(1)) also provide that nutrients shall be uniformly applied to fields during times and conditions that will hold the nutrients in place for crop growth, and protect surface water and ground water in accordance with the approved manure management practices as described in the manure management manual. There is nothing in the [NMA] or the regulations that would indicate they endorse the long term stockpiling of sewage sludge with no definite plan for spreading the material. The [T]ownship enforcement of its [O]rdinance in such a manner so as to prevent the stockpiling of sewage sludge for an extended period of time is certainly consistent with, and no more stringent than the requirements of the [NMA] and the [Pennsylvania] Code.

ZHB Op. at 5–6. Thus, the ZHB sustained the Township's enforcement notice. Applicants appealed to the Court of Common Pleas of Carbon County (trial court).

Without taking additional evidence, the trial court affirmed. This appeal by Applicants followed.

■ On appeal,[5] Applicants argue the ZHB erred in upholding the enforcement notice and permitting enforcement of the Ordinance in a manner that is inconsistent with and more restrictive than the NMA and its implementing regulations. Alternatively, they assert the ZHB erred in concluding the storage of nutrients on the subject property is prohibited under the terms of the Ordinance.

## I. NMA

Applicants first assert the ZHB erred in upholding the enforcement notice and permitting enforcement of the Ordinance in a manner that is inconsistent with and more restrictive than the NMA and its regulations. They contend the NMA prohibits local regulation of the construction, location or operation of facilities used for storage of animal manure or nutrients. *See Burkholder v. Zoning Hearing Bd. of Richmond Twp.*, 902 A.2d 1006 (Pa. Cmwlth.2006) (*en banc*). Applicants maintain Lorah's agricultural operation uses animal manure and is subject to the nutrient management measures set forth in the NMA and its regulations.

Applicants further assert the NMA's implementing regulations state "[m]anure shall be removed from temporary stacking areas for utilization on cropland or other acceptable uses *as soon as feasible.*" 25 Pa.Code § 83.421(d) (emphasis added). They argue the ZHB applied the Ordinance in a manner inconsistent with and more stringent than this regulation when it upheld the enforcement notice, which

5. Where the parties present no additional evidence after the ZHB's decision, the ZHB is the fact-finder. *Manayunk Neighborhood Council v. Zoning Bd. of Adjustment of City of Phila.*, 815 A.2d 652 (Pa.Cmwlth.2002). Because the parties presented no additional evidence after the ZHB's decision here, our review is limited to determining whether the ZHB committed an abuse of discretion or an error of law. *Id.*

requires immediate application or removal of nutrients from the temporary stacking facility. They maintain the practical effect of the enforcement notice is to prohibit the use of a temporary stacking facility for the storage of nutrients in connection with an agricultural operation, a use expressly permitted by the NMA and its attendant regulations.

Here, the ZHB determined the NMA and its regulations did not preempt enforcement of the Ordinance. More particularly, the ZHB determined under the NMA, a nutrient management plan is mandatory for all operators of CAOs. Here, the ZHB noted Lorah testified he does not house animals on the subject property, and, therefore, his operation does not qualify as a CAO. The ZHB further noted pursuant to the NMA any agricultural operation that is not a CAO may voluntarily develop a nutrient management plan and have it reviewed. Here, however, the ZHB determined, "[w]hile it was implied that Lorah had a nutrient management plan, neither Synagro, nor Lorah, submitted an approved plan to the [ZHB]." ZHB Op. at 6.

The ZHB further determined, pursuant to the NMA's regulations, a nutrient management plan must contain certain detailed information, and Applicants provided no such information here. Additionally, the ZHB observed there is nothing in the NMA or its regulations that would indicate they endorse the long term stockpiling of sewage waste with no definite plan for spreading the material. The ZHB concluded the Township's enforcement of its Ordinance in such a manner so as to prevent the stockpiling of sewage sludge for an extended period, is certainly consistent with, and no more stringent than, the requirements of the NMA or its regulations. For the following reasons, no error is apparent in the ZHB's determinations.

**A.**

The NMA's preemption provision states, in relevant part:

(a) **General.**—This chapter and its provisions are of Statewide concern and occupy the whole field of regulation regarding nutrient management and odor management, to the exclusion of all local regulations.

(b) **Nutrient management.**—*No ordinance* or regulation of any political subdivision or home rule municipality *may prohibit or in any way regulate practices related to the storage,* handling or land application *of animal manure or nutrients* or to the construction, location or operation of facilities used for storage of animal manure or nutrients or practices otherwise regulated by this chapter *if the municipal ordinance or regulation is in conflict with this chapter and the regulations or guidelines promulgated under it.*

\* \* \* \*

(d) **Stricter requirements.**—*Nothing in this chapter shall prevent a political subdivision or home rule municipality from adopting and enforcing ordinances or regulations which are consistent with and no more stringent than the requirements of this chapter and the regulations or guidelines promulgated under this chapter.*

Section 519 of the NMA, 3 Pa.C.S. § 519 (emphasis added).

 "The preparation and implementation of nutrient management plans is the centerpiece of the NMA." *Burkholder,* 902 A.2d at 1008 (citing Michael M. Meloy, *An Overview of Nutrient Management Requirements in* Pennsylvania, 10 Penn St. Envtl. L.Rev. 249 (2002)). To that end, preparation and implementation of a properly reviewed and approved nutrient man-

agement plan is mandatory for operators of CAOs. 3 Pa.C.S. § 506(b). Here, it is undisputed Lorah's operation is not a CAO. Therefore, a properly reviewed and approved nutrient management plan is not *required* for Lorah's operation.

■ While the NMA permits preparation and implementation of an approved nutrient management plan on a *voluntary* basis, *see* 3 Pa.C.S. § 506(h), Lorah did not prove he had an approved voluntary nutrient management plan. Notably, under the NMA regulations, a voluntary nutrient management plan must contain, among other things, certain detailed information required by Sections 83.391 through 83.441, 25 Pa.Code §§ 83.391–83.441.[6] Neither Lorah nor Synagro submitted this required information to the ZHB. As a result, Lorah did not prove compliance with the NMA through submission of an approved nutrient management plan.

■ We specifically reject the implication of Applicants' arguments that the NMA exempts the large quantity of sludge and waste here from *all* regulation. Under the NMA, the State Conservation Commission is vested with authority to review and approve nutrient management plans. Alternatively, the Commission may delegate to county conservation districts responsibility for reviewing and approving nutrient management plans. *See* Section 3 Pa.C.S. § 506(e) (plans required under the NMA shall be submitted to county conservation districts[7] for review and approval or alternatively to the State Conservation Commission for agricultural operations located in counties not delegated administrative authority under Section 504 of the

NMA, 3 Pa.C.S. 504); 25 Pa.Code § 83.241. Thus, the NMA shifts nutrient management from local control to broader state or county control. Any residual local regulation must be consistent with the NMA. However, nothing in the NMA evinces a legislative intent to entirely cease regulation of nutrient storage on farms.

■ Here, although there is testimony that suggests Applicants have some type of plan, no approved plan was submitted to the ZHB. In the absence of an approved plan under the NMA, we reject Applicants' argument that local regulation is inconsistent with regulation under the NMA. Were we to accept Applicants' contentions, we would need to tolerate a heap of more than 100 tons of sludge and waste piled for an extended period with no proof of review by any government authority.

This reasoning does not leave Applicants without a remedy. There are two remedies available to them. The first is to submit a voluntary plan under the NMA and to obtain approval for it. The second remedy is to eliminate the stockpile by planning shipments of sludge and other nutrients so that only amounts to be applied immediately or in the near future are delivered. This may require more than one delivery for an entire year.

**B.**

In addition, Applicants did not prove the Township is attempting to enforce its Ordinance in a manner inconsistent with or more stringent than the NMA and its implementing regulations.

---

**6.** These regulations were effective at the time of the ZHB hearing here, but were reserved effective October 1, 2006.

**7.** The NMA defines a "[c]onservation district" as "[a]ny *county* conservation district estab-

lished under the act of May 15, 1945 (P.L. 547, No. 217), known as the Conservation District Law." 3 Pa.C.S. 503 (emphasis added).

Applicants argue the enforcement notice, which requires removal or plowing of the wastes stored on the subject property within 10 days, represents an attempt to enforce the Ordinance in a manner more stringent than, and inconsistent with, an NMA regulation that states manure shall be removed from temporary stacking areas for use on cropland "as soon as feasible." 25 Pa.Code § 83.421(d). That regulation actually states, in its entirety (with emphasis added):

(d) When temporary manure stacking areas *may be necessary for the implementation of the plan, the plan shall identify* those areas available for the storage of manure due to unforeseen circumstances such as adverse weather conditions. *Manure shall be removed from temporary stacking areas for utilization on cropland or other acceptable uses as soon as feasible.*

The regulation contemplates the use of temporary manure stacking areas to the extent necessary to implement a nutrient management plan. As discussed above, Applicants did not submit an approved nutrient management plan. In the absence of such an approved plan, the regulation does not apply.

■ Moreover, the Township's enforcement of its Ordinance in such a manner so as to prevent the long-term stockpiling of sewage waste with no definite timetable for spreading the material, is not inconsistent with or more stringent than the NMA or its regulations. Indeed, as aptly noted by the trial court, "[t]here is nothing in the NMA or [its] regulations that would indicate that the NMA endorses the long term stockpiling of sewage sludge with no definite plan for spreading the material or encouraging crop growth." Tr. Ct. Slip Op. at 5.

*Burkholder*, relied on by Applicants, does not compel a different result. In *Burkholder* it was undisputed the landowners' extensive hog raising operation was a CAO, which was required to have a properly approved nutrient management. The landowner in *Burkholder* submitted a plan and received approval for it from the State Conservation Commission. In contrast, Applicants here did not prove compliance with the NMA or submit an approved plan.

## II. Township Ordinance

Alternatively, Applicants contend the ZHB erred in determining the storage of "Class A Biosolids" and food processing residual waste to use for the cultivation of the soil and the raising and harvesting of products of the soil on the subject property is not permitted under the Ordinance. They maintain the Ordinance does not prohibit the storage of materials used for the cultivation of the soil. Indeed, Applicants assert, they are entitled by right under the Ordinance to store manure on the subject property in connection with their agricultural operations. Further, Applicants argue, the storage of nutrients on the subject property does not fall within the definition of "intensive agricultural activity" contained in the Ordinance. Accordingly, they maintain, the ZHB erred in determining the storage of nutrients is "intensive agricultural activity" prohibited by the Ordinance.

■ Like statutes, the primary objective of interpreting ordinances is to determine the intent of the legislative body that enacted the ordinance. *See* 1 Pa.C.S. § 1921; *Adams Outdoor Advertising, LP v. Zoning Hearing Bd. of Smithfield Twp.*, 909 A.2d 469 (Pa.Cmwlth.2006), *appeal denied*, 592 Pa. 768, 923 A.2d 1175 (2007). Where the words in an ordinance are free from all ambiguity, the letter of the ordinance may not be disregarded under the pretext of pursuing its spirit. 1 Pa.C.S.

§ 1921; *see also* 1 Pa.C.S. § 1903 (words and phrases in a statute shall be construed in accordance with their common and accepted usage).

■■■ Additionally, a zoning hearing board is the entity responsible for the interpretation and application of its zoning ordinance. *Adams Outdoor Advertising.* A zoning board's interpretation of its zoning ordinance is entitled to great weight and deference from a reviewing court. *Id.* The basis for this deference is the knowledge and expertise a zoning hearing board possesses to interpret the ordinance it is charged with administering. *Id.*

Pursuant to Section 432(5) of the Ordinance, "agriculture" is a use permitted by right in an R–1 district. R.R. at 183a. However, "intensive agricultural activities" are prohibited in an R–1 district. *See* Section 432(5)(b) of the Ordinance; R.R. at 183a. The Ordinance defines "agriculture" as "(a) The cultivation of the soil and the raising and harvesting of the products of the soil, including nursery and horticulture but excluding forestry; (b) animal husbandry, poultry farming, and dairy farming, excluding kennels." Section 201 of the Ordinance; R.R. at 182a. In addition, the Ordinance defines intensive agriculture as "[s]pecialized agricultural activities including but not limited to mushroom, poultry, and dry lot livestock production, which due to the intensity of production or raw material storage needs, necessitate special control of operation, raw material storage and processing, and disposal of liquid and solid wastes." *Id.*

■■■ Applying these provisions here, the ZHB determined:

> In the case at bar, Lorah stockpiled more than 100 tons of sewage sludge on the [subject] property from May/June 2005 through October 2005. The stockpiling of sewage sludge cannot be considered agriculture or cultivation of the soil. It is simply the stockpiling of solid waste, which is not a permitted use in an R–1 district and which is prohibited as intensive agriculture.
>
> In addition, specialized agricultural activities which require intense raw material storage needs, are prohibited under the [O]rdinance. (Zoning Ordinance § 432(5)(b)[)]. Clearly, the storage for approximately five months, of more than 100 tons of sewage sludge is raw material storage which is beyond the purview of normal farming activity.

ZHB Op. at 5. We believe the ZHB's analysis, which is entitled to great deference from this Court, is consistent with the clear language of the Ordinance. Thus, we discern no error in the ZHB's determination that the stockpiling of more than 100 tons of sludge and waste on the subject property over a period of several months is not permitted as "agriculture" under the Ordinance.[8]

In addition, we reject Applicants' contention that the ZHB erred in sustaining the enforcement notice on the basis of Section 519 of the Ordinance where the Township did not prove Lorah's activities constituted a threat to public health and safety. More specifically, although the Township's enforcement notice states the activities on the subject property violate

---

8. Notably, Applicants do not argue the storage of the waste materials on the subject property constitutes an "accessory use" under the Ordinance. *See* Section 201 of the Ordinance (defining "accessory use" as "[a] subordinate use of a portion of a lot which is customarily incidental to the main or principal use of the land or of a building on a lot.") R.R. at 182a. Applicants failure to advance an accessory use argument is not surprising given the problems in proving the duration and extent of storage here is "customarily incidental" to agricultural use.

Section 519 because they pose a health or safety threat to the community, the ZHB did not sustain the enforcement notice on this basis. Rather, the ZHB based its decision on the fact that Lorah's use of the subject property was not permitted as "agriculture" under the Ordinance, but rather it constituted intensive agricultural activity which is prohibited in an R–1 district. Indeed, the ZHB's opinion does not even reference Section 519 of the Ordinance; therefore, Applicants' argument fails.[9]

For the foregoing reasons, we affirm.

### ORDER

AND NOW, this 18th day of January, 2008, the order of the Court of Common Pleas of Carbon County is **AFFIRMED.**

9. Finally, contrary to Applicants' assertions, the Township presented sufficient evidence to allow the ZHB to uphold the enforcement notice here. More specifically, the Township Zoning Officer testified when he inspected the subject property, he observed a stockpile of waste 20 or 30 feet in width, 40 or 50 feet in depth, and 8 or 10 feet in height. He further testified the waste remained stockpiled on the subject property for several months. The Zoning Officer testified he never observed stockpiling of waste like that on the subject property on any other farm he inspected. He further opined the stockpiling of such waste constituted intensive agricultural use, which is prohibited in an R–1 district. In short, the Zoning Officer's testimony provided sufficient support to allow the ZHB to uphold the enforcement notice.