Russell **BERNER** and Donna Berner, Kendall Dobbins, Nathan Roberts, Roberts Realty, LLC, and Robert D. Clark, Appellants

v.

**MONTOUR TOWNSHIP,** Montour Township Board of Supervisors and Scott Sponenberg.

Commonwealth Court of Pennsylvania.

Argued June 15, 2015.

Decided July 9, 2015.

William J. Cluck, Harrisburg, for appellants.

Matthew M. Hennesy, Lancaster, for appellee Scott Sponenberg.

BEFORE: ROBERT SIMPSON, Judge, P. KEVIN BROBSON, Judge, and JAMES GARDNER COLINS, Senior Judge.

OPINION BY Judge ROBERT SIMPSON.

In this land use appeal, Objectors[1] ask whether the Court of Common Pleas of the 26th Judicial District (Columbia County Branch) (trial court) erred in affirming a decision of the Montour Township Board of Supervisors (Supervisors) that approved, subject to conditions, Scott Sponenberg's (Applicant) land development application and plan that contemplate construction and operation of a swine nursery and manure storage facility. Objectors assert the trial court erred in determining the Nutrient Management Act (NMA), 3 Pa.C.S. §§ 501–522, preempts Montour Township's Subdivision and Land Development Ordinance (SALDO) with regard to the suitability of the soil on Applicant's property for the application of pig manure. They also contend Applicant's land development plan did not satisfy mandatory design standards for the width of local roads. Upon review, we affirm on other grounds.[2]

## I. Background

Applicant owns the property located at 140 Tower Drive (property) in Montour Township (Township), Columbia County. The property lies in an agricultural zoning district.

In May 2013, Applicant filed a land development application seeking preliminary/final plan approval for "construction of a nursery barn with an underhouse [sic] manure storage structure. Related access drives, stormwater facilities, and a com-

poster.... The current land use is agricultural use." Reproduced Record (R.R.) at 5a.[3] According to Applicant's land development plan, the property has a total area of 82.4 acres. In addition to the property, Applicant's proposal contemplates the lease of an additional 28 acres.

In support of his application, Applicant submitted numerous documents to the Montour Township Planning Commission (Planning Commission) and the Supervisors, including, among other things, site and engineering plans, a Department of Environmental Protection (DEP) Chapter 91 Manure Management Plan, a geologic report and a storm water management plan. The Township Engineer and the Planning Commission offered comments on Applicant's proposal. The Township also retained a professional geologist, who reviewed Applicant's proposal and offered comments.

In opposition to Applicant's proposal, Objectors submitted the report of a professional geologist and soil scientist, and a road condition survey of Tower Drive, a local road that abuts a portion of the property.

The Township retained a professional planner, who reviewed all of the documents and reports related to Applicant's proposal, including the expert geologic reports submitted by Applicant and Objectors. Ultimately, he recommended approval of Applicant's application and plan with conditions.

1. Objectors are Russell and Donna Berner, Kendall Dobbins, Nathan Roberts, Roberts Realty, LLC and Robert D. Clark.

2. *See, e.g., N. Bethlehem Neighbors Group v. City of Bethlehem Zoning Hearing Bd.*, 822 A.2d 840 (Pa.Cmwlth.2003) (this Court may affirm the trial court's order based on a different rationale if the basis for our decision is clear on the record).

3. According to Applicant's land development plan, in May 2013, Applicant received special exception approval (subject to two conditions) for his proposed use from the Montour Township Zoning Hearing Board. *See* Certified Record, Item # 11 (Land Development Plans) at 1 (Title Sheet).

Thereafter, the Planning Commission recommended approval of the revised plan with conditions. Shortly thereafter, the Supervisors approved the plan subject to 10 conditions. One of the conditions requires Applicant to retain a certified water testing company to perform baseline well water tests for wells within a 2,500–foot radius from the property lines of the proposed manure application fields and to conduct additional testing 12 months after the first application of manure.

In addition, the Supervisors imposed a condition that requires Applicant to develop, maintain and implement a manure management plan that satisfies all applicable state requirements, including DEP Chapter 91 standards, to ensure the proper storage and land application of manure generated as a part of Applicant's proposed use. Additionally, the Supervisors required Applicant to annually secure a bond to cover potential damage to Tower Drive caused by overweight vehicles operating on that road as a result of Applicant's use. Objectors appealed the Supervisors' conditional approval to the trial court.

Before the trial court, the parties filed briefs. However, the trial court did not receive any additional evidence. The Supervisors did not participate in the proceedings before the trial court.

Ultimately, the trial court issued an opinion and order upholding the Supervisors' conditional approval. In its opinion, the trial court provided the following analysis, in its entirety:

> Initially, this court concludes that its scope of review is whether the governing

body has committed an error of law or abused its discretion.

> Secondly, this court concludes that the [SALDO] cannot regulate the application on land of animal manure, as there is a specific pre-emption set forth in the [NMA], 3 Pa.[C.S. § 519(b)]. [Objectors'] argument that the ... SALDO is not preempted because manure is a 'pathogen' is without merit.

> Lastly, this court concludes that the [Supervisors] did not abuse [their] discretion. In acting on [Applicant's] application, the [Supervisors] received extensive evidence, reviewed several expert reports, and imposed substantial conditions on [Applicant] before granting him conditional approval.

> Accordingly, this court cannot conclude that the [Supervisors] made an error of law or abused [their] discretion.

Tr. Ct., Slip Op., 8/4/14, at 2 (citation and quotations omitted). Objectors appealed.

The trial court then directed Objectors to file a Concise Statement of the Errors Complained of on Appeal (Statement), which they did. The trial court issued a brief supplemental opinion in which it opined that Objectors waived the assertion that they sought a remand to the Supervisors or to conduct a *de novo* hearing because they did not raise that issue at argument before the trial court. The trial court further stated that in its prior opinion it addressed all other issues Objectors raised in their Statement. This appeal is now before us for disposition.[4]

## II. Issues

On appeal,[5] Objectors state two issues. Specifically, they ask:

4. The Township is not participating in this appeal.

5. Where the trial court takes no additional evidence, our review in a land development appeal is limited to determining whether the

local governing body committed an error of law or an abuse of discretion. *Robal Assocs., Inc. v. Bd. of Supervisors of Charlestown Twp.*, 999 A.2d 630 (Pa.Cmwlth.2010) (*en banc*).

Whether the [NMA], 3 Pa.[C.S.] § 519(b) preempted [the SALDO] with respect to the suitability of the soil on [Applicant's] property for the application of pig manure. The [trial] court held the State statute preempted the local ordinance.

Whether [Applicant's] land development application met the mandatory design standards for width of local roads. The [trial] court did not expressly analyze this issue. Instead, the [trial] court held the [Supervisors] received extensive evidence, reviewed several expert reports, and imposed ten substantial conditions on [Applicant] before granting him conditional approval.

Am. Br. for Appellants at 2.[6]

## III. Discussion

### A. NMA/Soils

#### 1. Contentions

Objectors first argue the trial court erred in concluding Section 519(b) of the

---

6. At oral argument, counsel for Objectors attempted to raise a third issue, asserting a remand was appropriate where the Supervisors did not hold a hearing or issue a decision containing findings of fact and conclusions of law. In response to this Court's question as to whether Objectors raised this issue in their brief, Objectors' counsel stated the issue was raised in the "Scope of Review and Standard of Review" Section of their brief, which states, as relevant: "[T]he [Supervisors] did not hold a hearing pursuant to Section 908 of the [Pennsylvania Municipalities Planning Code (MPC), Act of July 31, 1968, P.L. 805, *as amended,*] 53 P.S. § 10908, and neither [the trial court] nor the [Supervisors] issued findings of fact. [Objectors] suggest this Honorable Court review this matter de novo." *See* Am. Br. for Appellants at 1.

Our review of Objectors' brief reveals Objectors did not sufficiently develop this issue in the argument section of their brief in order to properly preserve it for our review. *See In re Tax Claim Bureau of Lehigh County 2012 Judicial Tax Sale,* 107 A.3d 853 (Pa.Cmwlth. 2015) (a party's failure to develop an issue in the argument section of its brief constitutes waiver of the issue). Moreover, as this Court indicated at oral argument, Objectors' brief does not seek a remand; rather, it seeks reversal of the trial court's decision. Additionally, our review of the certified record before the trial court, including Objectors' land use appeal, reveals that Objectors raised no issue regarding the Supervisors' failure to hold a hearing or issue findings of fact and conclusions of law until Objectors filed their Concise Statement of Errors Complained of on Appeal. Objectors' failure to raise this issue before the trial court also results in waiver. *See, e.g., In re Brandywine Realty Trust,* 857 A.2d 714 (Pa.Cmwlth.2004) (failure to raise issue before trial court results in waiver); *Keller v. Zoning Hearing Bd. of Twp. of Unity* (Pa.Cmwlth., No. 1797 C.D.2011, filed June 22, 2012), 2012 WL 8692952 (unreported) (citing *Morrell v. Zoning Hearing Bd. of Borough of Shrewsbury,* 17 A.3d 972 (Pa.Cmwlth. 2011)) (where review of record, including land use appeal filed with the trial court, revealed appellant did not raise issue at every stage of the proceedings, court deemed issue waived).

In any event, even if not waived, Objectors' argument fails. Specifically, Objectors incorrectly cite Section *908* of the MPC, which governs proceedings before a *zoning hearing board.* Applicable here is Section *508* of the MPC, which governs subdivision and land development proceedings. That provision does *not* require a local governing body to hold a hearing when considering a land development proposal. *See Miravich v. Twp. of Exeter,* 6 A.3d 1076 (Pa.Cmwlth.2010). Further, "[w]hen [a land development] application *is not approved* in terms as filed the decision shall specify the defects found in the application and describe the requirements which have not been met and shall, in each case, cite to the provisions of the statute or ordinance relied upon." 53 P.S. § 10508(2) (emphasis added). Here, the Supervisors did not disapprove Applicant's application; rather, they approved it with conditions that Applicant accepted. Thus, the Supervisors were not required to describe the defects in the application or cite ordinance provisions in support of the imposed conditions. *See Koller v. Weisenberg Twp.,* 871 A.2d 286 (Pa.Cmwlth. 2005).

Further, this is not a case like *Hamburg Logistics Park, LP v. Board of Supervisors of*

NMA preempted the SALDO. They assert there is no conflict between the NMA and the SALDO's provisions pertaining to hazardous conditions such as the unsuitability of soil for application of liquid manure, and the trial court did not identify any such conflict. Indeed, Objectors contend, there is no conflict as the state does not expressly regulate soil quality.

Objectors assert they submitted substantial evidence as to the unsuitability of the soils on Applicant's property for application of manure. They further maintain the Supervisors did not make any findings of fact or conclusions of law in their conditional approval. There was no formal hearing to enable the testimony and cross-examination of experts who prepared reports on the site geology and hydrogeology. Moreover, Objectors contend, where the trial court did not accept additional evidence, it was error to determine state law preempted the local ordinance without any analysis of the scope of preemption or whether there was a perceived conflict.

Objectors argue Section 519(b) of the NMA contemplates "conflict preemption." They assert this Court interpreted the NMA's conflict preemption provision in several recent cases. *See Office of Attorney General v. Locust Twp.*, 49 A.3d 502 (Pa.Cmwlth.2012) (*en banc*); *Walck v. L. Towamensing Twp. Zoning Hearing Bd.*, 942 A.2d 200 (Pa.Cmwlth.2008); *Burkholder v. Zoning Hearing Bd. of Richmond Twp.*, 902 A.2d 1006 (Pa.Cmwlth.2006) (*en banc*).

Objectors note that their research did not uncover any authority that addresses whether the NMA preempts local regulation of soil quality. However, the Supreme Court addressed the interplay between state and local law where state law purports to preempt local law. In the context of oil and gas operations, the Supreme Court addressed the preemption doctrine in *Huntley & Huntley, Inc. v. Borough Council of Borough of Oakmont*, 600 Pa. 207, 964 A.2d 855 (2009). There, Objectors argue, the Supreme Court recognized a "how" versus "where" distinction within the preemption doctrine. Thus, while state law may preempt the "how" of certain industry practices, zoning and land development ordinances enacted under the Pennsylvania Municipalities Planning Code (MPC) [7] may regulate "where" these practices may occur.

Here, Objectors maintain, the state does not regulate soil quality where liquid manure is applied to land. The state regulates the ability of a crop to handle certain amounts of manure, but does not address whether the soil itself is suitable for manure application. Applicant's consultant,

---

*Perry Township*, 114 A.3d 901 (Pa.Cmwlth., No. 719 C.D.2014, filed May 29, 2015) (unreported), mentioned by Objectors at oral argument. There, we held a trial court erred in reversing a local governing body's conditional approval of a subdivision and land development plan on the ground that the governing body did not cite specific SALDO or statutory provisions in support of each attached condition. We remanded for factual findings and a determination as to the propriety of the attached conditions on the merits.

Here, unlike in *Hamburg Logistics*, we are not confronted with an applicant's rejection of conditions, or a trial court's reversal of such a decision based on the governing body's failure to cite authority in support of each attached condition. Rather, Applicant here accepted the conditions, and, on Objectors' appeal, the trial court determined the Supervisors did not abuse their discretion in conditionally approving the plan. As explained more fully below, we agree with the trial court that the Supervisors properly granted conditional approval based on the record before them. As such, a remand would be unnecessary even if Objectors properly preserved this issue.

7. Act of July 31, 1968, P.L. 805, *as amended,* 53 P.S. §§ 10101–11202.

TeamAg, acknowledged the state does not require an analysis of soil suitability for manure application. R.R. at 316a.

Objectors point out that they retained B.F. Environmental Consultants, Inc., to review the NMA plan and the soil quality for the proposed pig nursery. R.R. at 49a. The facility intends to house 4800 pigs for 319 days a year, which will generate 1,289,-986 gallons of manure annually. Brian Oram, a professional geologist and soil scientist, prepared the report. He observed that Applicant's manure management plan did not base manure loading rates on specific soil or subsurface conditions, but rather on crop demand. R.R. at 51a.

Objectors note Oram relied on the Natural Resources Conservation Service's (MRCS) interpretation regarding suitability of soil for manure management, which classifies areas of Applicant's property as "very limited" and "somewhat limited" for application of manure. R.R. at 60a, 62a, 73a–105a. They also assert the Township Engineer retained Advantage Engineers to review Oram's report and Applicant's manure management plan, and Advantage Engineers confirmed the soil data characterized by NRCS. R.R. at 276a–77a. Additionally, Oram determined the proposed land development would violate Section 501(1)(C) of the SALDO, which relates to development of land that is subject to hazardous conditions. Here the hazardous condition is the unsuitability of the soil for the application of over a million gallons of pig manure annually.

Objectors maintain local residents rely on well water for their drinking water supply. Contaminated runoff or infiltration of poorly-renovated water to the underlying aquifer creates an adverse impact on the environment and a threat to public health and safety. Section 506(4) of SALDO addresses environmental impacts of proposed land developments. Objectors

argue the documents they submitted to the Supervisors reveal the soil on the property is not suitable for application of pig manure and the proposed land development did not comply with Sections 501(1)(C) and 506(4) of the SALDO. The Township Engineer recommended consideration of limited soil testing for manure application areas. R.R. at 305a. Also, in response to Oram's report on soil suitability, the Planning Commission recommended one time core samples, one every 10 acres, to determine suitability for manure application. R.R. at 9a. However, Applicant rejected that proposed condition. R.R. at 13a.

Applicant responds that the trial court correctly concluded the Supervisors did not err or abuse their discretion in approving Applicant's plan. Applicant asserts the SALDO does not regulate soil suitability for the land application of manure. Further, even assuming it does regulate soil suitability for land application of manure, the NMA preempts any such local regulation.

Applicant argues the SALDO does not, and cannot, regulate the land application of manure. Objectors' argument that the SALDO can effectuate the same result by another name, such as soil suitability, is untenable. As determined by the trial court, Objectors' soil suitability argument lacks merit.

Applicant contends the SALDO does not expressly regulate soil suitability or soil quality. The only sections of the SALDO identified by Objectors in connection with their challenge to the Supervisors' approval of Applicant's plan are Sections 501(1)(c) and 506(4) (the only provisions set forth in their appeal to the trial court). However, neither of those provisions regulates soil suitability or soil quality.

Specifically, Section 501(1)(C) of the SALDO is focused on hazardous conditions

that exist *prior to development*, while Objectors allege a hazardous condition *will be created by a new use after development*. The hazard alleged by Objectors here is the suitability of soil for application of pig manure. Applicant contends there is no pre-existing "hazardous condition" that can be regulated pursuant to Section 501(1)(C), and the plan could not be rejected based on that provision. To that end, there is no suggestion here that the soil itself is a "hazardous condition" within the meaning of Section 501(1)(C). Applicant notes Objectors argue the property defect is the suitability of the soil for the application of 1,289,986 gallons of pig manure. From their argument, it is clear the soil itself does not present a hazardous condition. Rather, Objectors seek to regulate the application of manure.

Next, Applicant points out, Objectors assert the Supervisors should have rejected Applicant's plan based on Section 506(4) of the SALDO. However, that provision only states that, if necessary, the Planning Commission may require an environmental assessment. The decision whether or not to require an environmental assessment is completely discretionary. The only alleged adverse impact here is Objectors' purely hypothetical contention that spreading manure might allow water contamination if the soil is unsuitable. The parties addressed that concern through submission of expert reports. The geologic reports presented to the Supervisors concerning the quality of soil and condition of the land on which manure would be applied provided a sufficient basis for the Supervisors to determine the proposed development and manure application would not adversely impact the environment. Under these circumstances, Section 506(4) of the SALDO does not justify denial of Applicant's plan.

Applicant further contends, even if the SALDO could be read to regulate soil suitability or soil quality, the NMA preempts the SALDO from regulating the application of animal manure. To that end, the applicable NMA section, 3 Pa.C.S. § 519, states, as pertinent: "No ordinance ... of any political subdivision ... may prohibit or in any way regulate practices related to the storage, handling or land application of animal manure...." *Id.* Applicant points out that Objectors assert the suitability of soils for manure application is an issue that is not preempted under state law. The NMA, however, specifically provides that a local ordinance may not regulate in any way, the application of manure to the extent it conflicts with NMA requirements. Applicant asserts the General Assembly declared the NMA occupies "the whole field of regulation regarding nutrient management and odor management, to the exclusion of all local regulations." 3 Pa.C.S. § 519(a). Given the clear language in the NMA, Applicant contends, the Township could not regulate the application of manure by purportedly regulating the soil on which manure is applied. 3 Pa.C.S. § 519(b).

Further, Applicant argues Objectors misapply the "how vs. where" distinction in an effort to convince the Court that Applicant may apply manure to land "nowhere." The locations where Applicant proposed to apply manure are located in an agricultural zoning district and are in an Agricultural Security Area. R.R. at 12a.

In their reply brief, Objectors reiterate that Section 519(b) of the NMA is a "conflict preemption" provision and because there is no conflict between the SALDO and the NMA, the trial court erred in holding the SALDO was preempted. Objectors note Applicant ignores the clear language of Section 519(b), which only prohibits local ordinances that conflict with

state law. Objectors maintain further support for this proposition is found in Section 519(d), which specifically contemplates local regulation. Objectors contend that, because it is clear that Section 519(b) provides for conflict preemption, the remaining issue is whether there is an actual conflict between state and local law. They argue there is no dispute that state law does not regulate the suitability of soil for application of manure.

## 2. Analysis

With regard to the issue of preemption, our Supreme Court explains:

> [T]he mere fact that the General Assembly has enacted legislation in a field does not lead to the presumption that the state has precluded all local enactments in that field; rather, the General Assembly must clearly evidence its intent to preempt. Such clarity is mandated because of the severity of the consequences of a determination of preemption: If the General Assembly has preempted a field, the state has retained all regulatory and legislative power for itself and no local legislation in that area is permitted....
>
> There are three generally recognized types of preemption: (1) express or explicit preemption, where the statute includes a preemption clause, the language of which specifically bars local authorities from acting on a particular subject matter; (2) conflict preemption, where the local enactment irreconcilably conflicts with or stands as an obstacle to the execution of the full purposes of the statute; and (3) field preemption, where analysis of the entire statute reveals the General Assembly's implicit intent to occupy the field completely and to permit no local enactments. Both field and conflict preemption require an analysis of whether preemption is implied in or implicit from the text of the whole statute, which may or may not include an express preemption clause.

*Hoffman Mining Co., Inc. v. Zoning Hearing Bd. of Adams Twp., Cambria Cnty.*, 612 Pa. 598, 32 A.3d 587, 593–94 (2011) (emphasis added) (citations and quotations omitted).

The NMA contains a provision titled, "Preemption of local ordinances," which states, in its entirety:

> (a) **General.**—This chapter and its provisions are of Statewide concern and occupy the whole field of regulation regarding nutrient management and odor management, to the exclusion of all local regulations.
>
> (b) **Nutrient management.**—*No ordinance or regulation of any political subdivision* or home rule municipality *may prohibit or in any way regulate practices related to the* storage, handling or *land application of animal manure or nutrients* or to the construction, location or operation of facilities used for storage of animal manure or nutrients or practices otherwise regulated by this chapter *if the municipal ordinance or regulation is in conflict with this chapter and the regulations or guidelines promulgated under it.*
>
> (c) **Odor management.**—No ordinance or regulation of a political subdivision or home rule municipality may regulate the management of odors generated from animal housing or manure management facilities regulated by this chapter if the municipal ordinance or regulation is in conflict with this chapter and the regulations or guidelines promulgated under it.
>
> (d) **Stricter requirements.**—*Nothing in this chapter shall prevent a political subdivision* or home rule municipality *from adopting and enforcing ordinances or regulations which are consistent with and no more stringent than the require-*

*ments of this chapter and the regulations or guidelines promulgated under this chapter.* No penalty shall be assessed under any such local ordinance or regulation under this subsection for any violation for which a penalty has been assessed under this chapter.

3 Pa.C.S. § 519 (emphasis added). Construing this provision, this Court, speaking through Judge Brobson, stated (with emphasis added):

The [NMA's] preemption language is as perplexing as it is verbose. Nonetheless, we take the following legislative intent from the General Assembly's chosen words. First, in passing the NMA, the General Assembly unmistakably intended to occupy 'the whole field' of nutrient and odor management in the Commonwealth (subsection (a)). To that end, *the NMA prohibits the adoption and enforcement of any local ordinance that conflicts with the provisions of the NMA or 'regulations and guidelines promulgated under it' (subsections (b) and (c)). But, a municipality is free to adopt and enforce ordinances that 'are consistent with and no more stringent than' the NMA, its regulations, and its guidelines (subsection (d)).*

*Locust Twp.,* 49 A.3d at 506–07.

Here, despite concluding that the NMA preempts the SALDO, the trial court did not identify any conflict between the NMA or its regulations and Sections 501(1)(C) and 506(4) of the SALDO, relied on by Objectors. Similarly, in both its brief to this Court and at oral argument, Applicant did not specifically identify any such conflict. In the absence of any clearly identified conflict, it does not appear that the NMA or its regulations preempt the SALDO here.

However, despite the absence of any identified conflict, our review of the NMA's regulations relating to the preparation of "nutrient management plans," which are the "centerpiece of the NMA," *Burkholder,* 902 A.2d at 1008 (citation omitted), reveals the existence of numerous provisions [8] that regulate the application of manure as it relates to soils and, more importantly, the protection of ground and surface water, which appears to be Objectors' primary concern. Thus, despite the fact that the SALDO does not appear to specifically conflict with the NMA or its regulations, it does appear the NMA's regulations address Objectors' concerns regarding soil quality as it relates to potential groundwater contamination. Neither the parties nor the trial court specifically referenced these regulations.

Nevertheless, regardless of whether the NMA and its regulations preempt the SALDO, we disagree with Objectors that Applicant's plan violates the SALDO provisions cited by Objectors. Where a subdivision or land development plan complies with all objective provisions of the applicable SALDO as well as all other applicable regulations, the plan must be approved. *Robal Assocs., Inc. v. Bd. of Supervisors of Charlestown Twp.,* 999 A.2d 630 (Pa.Cmwlth.2010) (*en banc*). A governing body may impose on the approval of a subdivision or land development reasonable and economically feasible conditions. *Koresko v. Farley,* 844 A.2d 607 (Pa.Cmwlth.2004).

Objectors assert Applicant's plan violates Sections 501(1)(C) and 506(4) of the SALDO on the ground that the soils on the property are unsuitable for manure application. However, neither of those provi-

**8.** *See* 25 Pa.Code §§ 83.272, 83.281, 83.282, 83.292, 83.293, 83.294, 83.311, 83.312, 83.321, 83.342, 83.351, 83.381.

sions expressly regulates soil quality or suitability.

More particularly, Section 501(1)(C) provides:

## § 501.  Application.

All subdivisions and land developments approved by the Planning Commission and [Supervisors] must comply with the following standards.  The standards outlined herein shall be considered minimum requirements for the promotion of the public health, safety, morals and general welfare.

1.  General standards.

\* \* \* \*

C.  Land subject to hazardous conditions such as open quarries, floods, precipices and a water supply which does not meet U.S. Public Health Service standards shall not be subdivided or developed until the hazards have been eliminated or unless adequate safeguards against such hazards are provided by the final plans.

*Id.;*  R.R. at 138a.

In addition, Section 506(4) states:

## § 506.  Environmental and Landscape Considerations.

\* \* \* \*

4.  Environmental assessment.  Subdivision and land development proposals will be required to demonstrate that the development will not create adverse impact upon the environment.  Where determined necessary, the [Planning] Commission may require an environmental assessment for a proposed subdivision or land development.  If the environmental assessment finds significant adverse impact, an environmental impact statement may be required.

Changes in the proposal may be required to avoid such impact.

*Id.;*  R.R. at 150a, 152a.

The Supervisors here did not find that Applicant's plan violated either of these SALDO provisions.  For the reasons that follow, we reject Objectors' arguments that the Supervisors erred or abused their discretion in failing to deny Applicant's plan based on its alleged non-compliance with Sections 501(1)(C) and 506(4) of the SALDO.

First, pursuant to Section 501(1)(C) of the SALDO, land subject to hazardous conditions such as open quarries, floods, precipices and a water supply that does not meet U.S. Public Health Service standards shall not be developed until the hazards are eliminated or unless adequate safeguards against such hazards are provided by the final plans.  Objectors argue this provision bars Applicant's plan because the soils on the property are unsuitable for the application of manure and, as a result, manure application will contaminate the local water supply.  This argument fails.

Section 501(1)(C) of the SALDO regulates "[l]and *subject to* hazardous conditions" and sets forth four enumerated examples.  *Id.* (emphasis added).  It states that such land "shall not be . . . developed *until* the hazards have been eliminated or unless adequate safeguards against such hazards are provided by the final plans." *Id.* (emphasis added).  Based on the plain language of this provision (including the enumerated examples), we agree with Applicant that Section 501(1)(C) speaks to already existing hazardous conditions on land.  Here, Objectors do not claim the property itself is subject to any "hazardous conditions"; rather, they assert the soil on the property is unsuitable for manure application.  Thus, by itself, the soil is not a

"hazardous condition" within the meaning of Section 501(1)(C) of the SALDO.

In addition, Objectors' argument that the soils on the property are unsuitable for manure application is premised entirely on the report of their expert, Brian Oram, P.G. Contrary to Objectors' suggestions, however, the Supervisors were not required to accept as fact the opinions expressed in Oram's report. Moreover, while Oram opined the soils on the property are, at least in part, not suitable for manure application, as to the potential for groundwater contamination created by the types of soils on the property, in the conclusion section of his report, Oram stated:

Regional baseline surface and groundwater monitoring is warranted and the project should be required to determine the direction of groundwater flow and regional water quality conditions. An aquifer testing plan should be required for the proposed well that includes monitoring the proposed well, other onsite wells, and a number of surrounding private wells to confirm that facility will have adequate water to meet peak demands for the existing and proposed facilities and produces water that is potable. It is our professional opinion that the project can not be approved until these deficiencies are corrected so the project meets the requirements of the SALDO....

R.R. at 72a. As explained more fully below, the Supervisors imposed a condition on the approval of Applicant's plan that requires water testing prior to Applicant commencing any land application of manure and additional testing after Applicant commences its operation.

Further, the Township Engineer retained Advantage Engineers to evaluate "the potential impacts to the hydrogeologic conditions at and in the vicinity of [Applicant's] property." R.R. at 276a. In his report, Steven R. Read, a professional geologist and senior hydrogeologist with Advantage Engineers, who reviewed numerous documents relating to Applicant's proposal, including the reports authored by geology experts for Objectors and Applicant, opined:

Overall, there should be minimal risk to the underlying bedrock aquifer and nearby wells from a well managed facility of this kind with properly applied manure and suitable stormwater management, barring a catastrophic manure tank failure or substantial and ongoing leak front the manure tank. However, we are unable to provide a more detailed opinion with respect to possible impacts to the groundwater until further information is provided.

R.R. at 277a (emphasis added).

As to Read's statement concerning the need for further information, Jerry Walls, FAICP, a professional planner retained by the Planning Commission to review Applicant's proposal, opined:

I recommend that Baseline water quality and volume of yield testing of all water wells within 2,500 feet of the Pig Nursery Barn and Manure Storage Facilities be conducted by a certified laboratory with the results to be mailed directly to the [Planning Commission] prior to any construction. This documentation can be invaluable to ascertain cause if future well contamination or yield reduction arise on neighbor's wells.

R.R. at 381a. Walls further opined:

After review of both the Oram Report and the Read Report I do not see any need to revise my recommendations. I do note that Mr. Read refers to a 1,000 feet distance for a Background Study of existing nearby wells. His intent for such study appears to be somewhat different from my reasoning. I made the

recommendation that all wells within 2,500 feet of the Nursery be tested before construction in an effort to establish Baseline Water Quality and Yield in the event of potential future suspected impacts from the Pig Nursery or even other future land developments. Such Baseline data can work to the benefit of BOTH the homeowner and/or the farmer. Factual future well testing data in the event of a problem will determine who will benefit.

R.R. at 384a.

Ultimately, the Supervisors attached the following condition to their approval of Applicant's plan:

Applicant shall hire a certified water testing company, of [A]pplicant's choosing, to make baseline coliform and nitrate well water tests from a maximum of six (6) clew gradient water wells locat[ed] within a 2,500 foot radius from the property lines of the proposed mature application fields. The six (6) down gradient water wells shall be selected by the Township's hydro-geologist. This baseline testing shall be conducted before the first application of manure to these fields. Approximately twelve (12) months after the first application of manure application [sic] Applicant shall retain a certified water testing company of, Applicant's choosing, to conduct coliform and nitrate testing from the same wells sampled as a part of the baseline testing on a one time basis. Applicant shall provide a copy of the results of the baseline testing and the subsequent 'one time' testing to the Township and each well owner. The costs associated with this well testing shall be paid by Applicant.

R.R. at 376a. Thus, the Supervisors attached a condition to respond to the concerns expressed by Objectors regarding potential groundwater contamination. For all the above reasons, we reject Objectors' assertions that the Supervisors erred or abused their discretion in failing to deny Applicant's plan on the ground that it violates Section 501(1)(C) of the SALDO. To the extent Objectors raised concerns regarding potential water contamination, the Supervisors attached a condition to address it. Objectors' brief is devoid of any argument that explains why the condition attached by the Supervisors is insufficient to address their concerns.

■ Objectors also briefly refer to the plan's alleged non-compliance with Section 506(4) of the SALDO. However, a careful review of Objectors' brief reveals Objectors do not clearly explain *how* Applicant's plan, or the Supervisors' conditional approval of the plan, fails to comport with this provision. As set forth above, Section 506(4) provides, in relevant part, that land development proposals are required to show a development will not create an adverse impact on the environment. *Id.* Further, "*[w]here determined necessary,* the [Planning] Commission *may* require an environmental assessment for a proposed ... land development. If the environmental assessment finds significant adverse impact, an environmental impact statement may be required. Changes in the proposal may be required to avoid such impact." *Id.* (emphasis added).

Based on our review of the record here, it is apparent that the Supervisors concluded Applicant's plan, together with the attached conditions, would not adversely impact the environment. Further, Section 506(4) of the SALDO vests the Planning Commission with discretion to require an environmental assessment. Thus, submission of an environmental assessment was not mandatory. *Id.*

More importantly, the only alleged adverse impact identified by Objectors concerns the potential impact on the local

water supply, which the Supervisors considered and addressed. Additionally, through its consultant, TeamAg, Applicant filed an extensive DEP Chapter 91 Manure Management Plan with DEP, which addresses, among other things, environmentally sensitive areas, including private or public drinking water wells. *See* R.R. at 323a, 324a, 332a, 335a. In light of all these circumstances, we disagree with Objectors that Section 506(4) of the SALDO provides a basis upon which to reject Applicant's plan.

## B. Road Width Requirement

### 1. Contentions

Objectors also argue the Supervisors erred in approving Applicant's plan where Tower Drive, the road adjacent to the property, does not meet design standards for minimum road width. Section 501 of SALDO requires all land developments to meet certain design standards, unless waived or modified. The design standards for local roads, such as Tower Drive, require a minimum cartway width of 20–22 feet. Objectors assert it is undisputed that the cartway width of the relevant sections of Tower Drive do not meet this standard. Objectors contend the trial court did not expressly address this issue.

Objectors maintain Section 501 of the SALDO's design standards are considered the minimum requirements for the promotion of public health, safety, morals and general welfare. One of those mandatory design standards applies to the width of streets. Section 502(1)(K) of SALDO requires that streets be designed and constructed in accordance with Pennsylvania Department of Transportation Publication 70, "Guidelines for Design of Roads and Local Streets." *Id.*

Further, Objectors assert, Section 502(2) of SALDO addresses street standards and references the Table of Road and Highway

Design Standards for Montour Township. Applicant's proposal is located along Tower Drive, which is a "local road" as defined in Section 202 of SALDO. For local roads, according to the Table of Road and Highway Design Standards for Montour Township, the cartway width must be at a minimum between 20 and 22 feet. Objectors contend that the relevant sections of Tower Drive do not meet that mandatory minimum width requirement.

Objectors assert they retained Peters Consultants to perform a road condition survey of Tower Drive, which determined the minimum measured width of the relevant section of Tower Drive is 16 feet. Peters Consultants also concluded Tower Drive will not support the projected increase in traffic, which could create a dangerous condition. *See* R.R. at 23a–27a. Objectors argue the Township Engineer agreed Tower Drive did not meet minimum local road width requirements. R.R. at 314a. Also, professional planner Jerry Walls did not contest Peters Consultant's conclusion that Tower Drive does not meet the minimum road width required by Section 502 of the SALDO. R.R. at 380a–83a.

In sum, Objectors contend it is undisputed that Tower Drive does not meet the minimum design standard for road width, and the Supervisors did not approve a modification or waiver of this requirement.

Applicant counters the Supervisors could approve his plan regardless of whether the abutting street met minimum width standards. He argues the SALDO provisions that Objectors allege the Supervisors ignored concern "right-of-way" width, not paved street width. Applicant maintains his plan provides for adequate "right-of-way" width as required by the SALDO.

Further, the record supports the Supervisors' discretionary decision to approve

the plan without requiring street widening. Applicant argues he does not own the entire relevant portion of the road at issue. Also, the Supervisors could not deny the plan based on anticipated truck traffic because the road is already used by other heavy trucks, logging vehicles, farm vehicles and school buses with similar weight and dimensional characteristics. Any incongruent treatment would violate Applicant's equal protection rights as there is no rational basis for treating trucks servicing Applicant's nursery differently than trucks servicing logging or dairy operations.

Applicant maintains Objectors' argument that Section 502(2) of the SALDO prohibits Applicant's plan because the relevant sections of Tower Drive do not meet minimum road width requirements is wrong for two reasons. First, Section 502(2) of the SALDO speaks to "right-of-way" width, not paved street width. In addition, that provision grants the Supervisors discretion to determine whether street widening is required.

### 2. Analysis

Section 502(2) of the SALDO states (with emphasis added):

Street standards. *Where a* subdivision or *land development abuts* or contains *an existing street of inadequate right-of-way width, a future right-of-way width shall be indicated on the plan to conform to the standards herein.* Provision for additional street width *may* be required by the [Supervisors] in specific

cases for on-street parking in commercial, industrial or high-density residential areas; additional widening where minimum widths will not meet the requirements of a specific street; and public safety and convenience.

*Id.* (footnote omitted). In turn, the SALDO defines "right-of-way" as "land set aside for use as a street, alley or other means of travel." Section 202 of the SALDO. It also defines "future right-of-way," in pertinent part, as: "The right-of-way width required for the expansion of existing streets to accommodate anticipated future traffic loads...." *Id.*

Thus, with regard to existing streets,[9] the relevant SALDO provision speaks to "right-of-way" width rather than "cartway"[10] width. Where a land development abuts an existing street of inadequate right-of-way width, the SALDO requires that an applicant indicate on the plan a future right-of-way width that conforms to applicable standards. Section 502(2) of the SALDO.

■ Here, Applicant's plan depicts a future right-of-way of 50 feet, including 25 feet to the center of Tower Drive. *See* Certified Record, Item # 11 (Applicant's Land Development Plans) at SP–1 (Overall Site Plan), D–1 (Access Drive Entrance Plan). For local roads, the SALDO requires a minimum cartway width of 20–22 feet. *See* SALDO, Table of Road and Highway Design Standards for Montour Township. Thus, Applicant's plan contains

9. Section 502(1)(K) of the SALDO, also referenced by Objectors, states that: "Streets *shall be designed and constructed* in accordance with Pennsylvania Department of Transportation Publication 70, 'Guidelines for Design of Roads and Local Streets.'" *Id.* (emphasis added). From a reading of the plain language of this section and Section 502(2) of the SALDO, it is apparent that Section 502(1)(K)

applies to the design and construction of new streets, unlike Section 502(2), which expressly relates to an "existing street" such as Tower Drive. *Compare* Section 502(1)(K) of the SALDO *with* Section 502(2) of the SALDO.

10. Section 202 of the SALDO defines "cartway" as "the portion of a street or alley intended for through vehicular travel."

sufficient future right-of-way width to satisfy Section 502(2).

In addition, the second part of Section 502(2) states that the Supervisors *may* require additional street width in specific cases for: on-street parking in commercial, industrial or high-density residential areas; additional widening where minimum widths will not meet the requirements of a specific street; and, public safety and convenience. *Id.* Based on the plain language of Section 502(2), this determination by the Supervisors is discretionary, not mandatory. *Id.* Therefore, it was *not required* here.

Moreover, as Applicant points out, because he does not own all of the properties that abut Tower Drive in the area, the Supervisors could not require him to widen or grant additional right-of-ways to widen the existing local road over these other properties. The Township Engineer recognized this in his review letter. R.R. at 314a–15a. He also indicated the Township could "require the posting of financial security to bond the road against any new damage that could be attributed to the trucks in excess of 8 tons that would service the proposed nursery barn at [the property]." R.R. at 315a.

To the extent Objectors raise concerns about the current condition of Tower Drive and potential damage caused by increased truck traffic occasioned by Applicant's proposal (which according to the Township Engineer would only average one truck round trip every three or four days, *see* R.R. at 314a), the Supervisors attached the following condition to their approval of Applicant's plan:

> Applicant will mutually secure a Bond which will cover potential damage to Tower Drive caused by Overweight Vehicles operating on Tower Drive as a result of Applicant's Use of the property. The Bond will cover potential damage and cost of repairs to Tower Drive as a result of the proposed use, in accordance with the provisions of the Motor Vehicle Code Section 4902. The amount of the Bond will be mutually agreed upon on annual basis by the Township Engineer and [Applicant's] representative.

R.R. at 377a–78a. Objectors make no attempt to explain how this condition is inadequate to address their concerns.

For all the foregoing reasons, we affirm on other grounds.

## ORDER

**AND NOW,** this 9th day of July, 2015, the order of the Court of Common Pleas of the 26th Judicial District (Columbia County Branch) is **AFFIRMED** on other grounds.